UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

ALKI PARTNERS, L.P. and ALKI FUND, LTD.,    09 Civ. 8125 (DAB)

               :

     Plaintiffs,

               :

   -against-          **FIRST AMENDED**

               :  **COMPLAINT**

VATAS HOLDING GMBH, LARS WINDHORST,
PETER A. OGRISEK, SAPINDA INTERNATIONAL :
LTD., ROBERT B. HERSOV, CREDIT SUISSE    JURY TRIAL DEMANDED
GROUP AG, and FREDERIC RUIZ,       :

       Defendants.     :

-------------------------------------------------------------------

   Plaintiffs Alki Partners, L.P. ("Alki Partners") and Alki Fund, Ltd. ("Alki Fund"), by

their attorneys, Gusrae, Kaplan, Bruno & Nusbaum PLLC, complaining against defendants,

allege and state as follows:

## JURISDICTION AND VENUE

   1.  This Court has subject matter jurisdiction pursuant to (a) 28 U.S.C. § 1331

because this action arises, in part, under 15 U.S.C. § 78j(b); and (b) 28 U.S.C. § 1367 for related

claims that are not pursuant to a Federal statute.

   2.  Defendants have directly and/or indirectly made use of the means and

instrumentalities of interstate commerce in connection with the transactions, acts, practices and

courses of business alleged in this Complaint.  Defendants have directly and/or indirectly

engaged in a fraudulent scheme to manipulate the market for the common stock of a Utah-based

corporation through transactions executed in the United States on the OTC Bulletin Board

quotation service.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(d) because defendants are aliens.

## SUMMARY

4.    This action arises from defendants' participation in a fraudulent scheme to manipulate the market for the stock of RemoteMDx, Inc. ("RMDX").    The scheme was effectuated by artificially affecting the forces of supply and demand for RMDX shares traded in the public market through lies and deceit.  By controlling large blocks of RMDX, defendants prevented shares of RMDX from freely trading.  The purpose of such conduct was to artificially inflate the price of the RMDX shares with the intent to reap profits.  As part of the manipulative scheme, defendants caused plaintiffs and others to purchase millions of shares of RMDX at artificially inflated prices.

5.    Defendants manipulated RMDX's stock prices by restricting supply and artificially creating demand for the stock.  Commencing in or around 2006, defendants Robert B. Hersov ("Hersov"), Lars Windhorst ("Windhorst") and Peter A. Ogrisek ("Ogrisek"), through VATAS Holding GmbH ("Vatas"), acquired shares and warrants in RMDX through private placements and other off-market transactions.  Vatas purposefully avoided acquiring shares of RMDX on the open market by instructing plaintiffs and others to purchase shares of RMDX with the understanding that Vatas would thereafter purchase the shares from plaintiffs and others in off-market transactions on a delivery-versus-payment ("DVP") basis through institutions in Europe, including defendant Credit Suisse Group AG ("Credit Suisse").   Vatas created substantial demand in the market for shares of RMDX by, amongst other methods, agreeing with plaintiffs and others to have them purchase shares of RMDX and to sell those acquired shares

off-market in a prearranged basis to defendants' controlled accounts through institutions in Europe including Credit Suisse.

6.      RMDX's stock was a thinly-traded security prior to defendants' fraudulent scheme to manipulate the market for the securities of RMDX.  RMDX's stock commenced trading on or around August 25, 2005 and traded in the $1.00 to $1.50 range until mid-2007.  By January 2008, however, defendants' manipulative scheme caused RMDX's stock to trade in the $4.00 range with unprecedented daily volume.

7.      Defendants created this demand by, amongst other things:    (a) making commitments to purchase large blocks of RMDX from plaintiffs and others that Vatas was incapable of purchasing as Vatas was under-capitalized and had limited ability and/or no intention of honoring its commitments to purchase certain shares of RMDX; (b) parking shares for RMDX which would eventually trade in the market; (c) floating blocks of RMDX in the clearing and settlement process; and (d) inducing financial institutions to acquire shares of RMDX without disclosing to these financial institutions that the defendants were manipulating the market forces of supply and demand for shares of RMDX and did not have the resources to pay for shares purchased on their behalf.  Defendants, in an effort to quiet plaintiffs' concerns, agreed to purchase plaintiffs' shares of RMDX.  Instead, Vatas purposefully reneged on its verbal and written agreements to purchase the RMDX shares from plaintiffs (and others), thus causing plaintiffs to suffer millions of dollars of losses.

8.      Upon information and belief, in furtherance of the effort of the defendants to artificially affect the supply of RMDX shares in the market, Defendant Windhorst issued in the money puts to holders of RMDX common stock in order to convince the recipients of the in the

3

money puts, who were intending to sell their RMDX shares into the market, to refrain from selling these RMDX shares into the market. These in the money puts were issued at a time when the issuer(s) of the in the money puts did not have sufficient capital to pay the in the money puts if executed by the put holders. Defendant Windhorst and his co-conspirators issued these in the money puts with the expectation that by issuing the in the money puts they would prevent intended sales of RMDX shares and therefore effectively manipulate the price of RMDX by preventing the sale of the RMDX shares which would have depressed the market price of RMDX shares upon sale into the open market.

## PARTIES

9.     Plaintiff **Alki Partners** is a limited partnership organized under the laws of the State of California. Since September 2008, Alki Partners maintains its principal offices at 401 Glenneyre Street, Laguna Beach, California. Prior to September 2008, Alki Partners maintained its principal offices at 500 108th Avenue NE, Bellevue, Washington.

10.     Plaintiff **Alki Fund** is a Cayman Island exempted company, with its registered office located at c/o Walkers SPV Limited, Walker House, P.O. Box 908 GT, George Town, Grand Cayman, Cayman Islands, BWI. Since September 2008, Alki Fund maintains its principal offices at 401 Glenneyre Street, Laguna Beach, California. Prior to September 2008, Alki Fund maintained its principal offices at 500 108th Avenue NE, Bellevue, Washington

11.     Defendant **VATAS Holding GmbH** is, upon information and belief, a private limited liability company organized under the laws of Germany with a principal office located at Friedrichstrasse 95, 10117, Berlin, Germany.

4

12.     Defendant **Lars Windhorst** is a citizen and resident of Germany.  At all times relevant to this Complaint, Windhorst was a Managing Director of Vatas.

13.     Defendant **Peter A. Ogrisek** is a citizen and resident of Germany.  At all times relevant to this Complaint, Ogrisek was a Managing Director of Vatas.

14.     Defendant **Sapinda International Ltd.** ("Sapinda") is, upon information and belief, a private corporation organized under the laws of Great Britain with a principal office located at 86 Jermyn Street, London, SW1Y, United Kingdom.  Sapinda is, upon information and belief, the sole shareholder of Vatas.

15.     Defendant **Robert B. Hersov** is, upon information and belief, a citizen of South Africa and resident of Great Britain.  Hersov is, upon information and belief, the principal shareholder of Sapinda.

16.     Defendant **Credit Suisse Group AG** is, upon information and belief, a public corporation organized under the laws of Switzerland with a principal office located at Paradeplatz 8, 8070 Zurich, Switzerland.  Upon information and belief, Credit Suisse maintains offices and does business in this Judicial District through various subsidiary businesses that Credit Suisse directly and/or indirectly owns and controls.

17.     Defendant **Frédéric Ruiz** ("Ruiz") is a citizen and resident of Switzerland.  At all times relevant to this Complaint, Ruiz was a Director of Credit Suisse.

## RELATED ENTITIES

18.     **RemoteMDx, Inc.** is a Utah corporation that sells tracking devices to monitor individuals in the criminal justice system.  At all times relevant to this Complaint, RMDX's

common stock was registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934.  At all times relevant to this Complaint, RMDX's common stock traded in the United States on the  OTC Bulletin Board ("OTC BB"),  a quotation service operated by the Financial Industry Regulatory Authority, Inc. ("FINRA").

19.    **IIU Nominees Limited** ("IIU") is an Irish registered limited company owned by Dermot F. Desmond ("Desmond") that serves as Desmond's personal investment vehicle.  IIU acquired 12.1 million shares of RMDX (approximately 12% of the public float)[1] on or about October 25, 2007 and disposed of the entire position on or about December 14, 2007 at a substantial profit.[2]  Upon information and belief, IIU's acquisition and sale of RMDX shares were not reported on the OTC BB.

20.    Desmond has a long-standing relationship with Hersov.  Prior to investing in RMDX, Desmond and Hersov co-invested in a German healthcare company, Curanum AG, and they currently own shares of the entities behind various websites, including a celebrity website, "thenod.com," and an interactive medical website for children, "medikidz.com."

---

[1] RMDX's public float was approximately 102,599,865 shares as reflected in RMDX's Form 10-KSB for the fiscal year ended September 30, 2007.

[2] On March 30, 2008, the Sunday Independent reported that: "Billionaire Dermot Desmond netted a huge profit cashing in his near 10 percent stake in US convict-tagging firm RemoteMDx.  It appears as if Mr. Desmond's IIU investment vehicle sold out of the US-listed firm just before Christmas, soon after the Sunday Independent revealed his shares had risen almost eightfold in value.  The stake was valued at as a much as 33m.  The timing for a disposal couldn't have been better as shares of RemoteMDx have tumbled nearly 75 per cent since the Irish investor's exit, falling from over $4 to about $1. …It has been one of Desmond's most spectacular coups in recent years."

21.    Upon information and belief, in or around January 2009, a complaint was filed against Vatas, Windhorst and Ogrisek with the Berlin Public Prosecutor's Office stemming from their failure to pay for shares of Curanum AG in a scheme similar to that alleged herein.

22.    **Coval Investments Limited** ("Coval") is a Bahamian entity which acquired 12,782,465 shares of RMDX (approximately 12.4% of the public float) in October 2007 and sold 12.1 million shares on or about October 29, 2007.   Upon information and belief, Coval's acquisition and sale of RMDX shares were not reported on the OTC BB.

23.    **Arcola Global Investments Limited** ("Arcola") is a British Virgin Islands entity which acquired 6,500,000 shares of RMDX (approximately 6.3% of the public float) on or about October 18, 2007.  Upon information and belief, Arcola's acquisition and sale of RMDX shares were not reported on the OTC BB market.  Upon information and belief, Arcola has ties to Vatas through its director, Kamal Abdullah S. Bahamdan ("Bahamdan"), a Saudi Arabian investor. Upon information and belief, Bahamdan previously invested in a German airline, Air Berlin, contemporaneous with Vatas' investments in Air Berlin.

24.    **Norddeutsche Landesbank Girozentrale** ("Nord LB") is a corporation organized under the laws of Germany.  Nord LB is one of the largest banks in Germany and is owned by German savings banks and two German states.

25.    Like plaintiffs, Nord LB was used by defendants in furtherance of their scheme to manipulate the market price of RMDX.  From on or about November 1, 2007 through on or about February 25, 2008, Nord LB purchased and sold substantial blocks of RMDX stock, purportedly on behalf of Vatas, none of which, upon information and belief, were reported on the OTC BB.  As of February 25, 2008, Nord LB held 31,024,000 shares of RMDX (approximately

30.3% of the public float), at a cost of approximately $116,616,015, purportedly with the understanding that Vatas would immediately purchase these shares from Nord LB. Vatas, however, did not honor its obligation to purchase the shares of RMDX causing Nord LB to liquidate the position at a loss of tens of millions of dollars.

26.    Upon information and belief, defendants used Nord LB and others to remove shares of RMDX from the marketplace and allow others acting in concert with the defendants to sell shares of RMDX at inflated prices in amounts that the market would not otherwise have absorbed without dramatically reducing the market prices for RMDX. Upon information and belief, Vatas was under-capitalized and incapable of paying for the shares of RMDX purchased on Vatas' behalf by Nord LB.

27.    Upon information and belief, as a result of the conduct described above, Nord LB filed a criminal complaint in Germany against Vatas and Windhorst. Upon information and belief, a German public prosecutor investigated Nord LB's allegations and thereafter filed criminal charges against Vatas and Windhorst.

## FACTS COMMON TO ALL CLAIMS

28.    Alki Partners and Alki Fund[3] are hedge funds engaged in the purchase and sale of securities during all times relevant to the Complaint.

29.    Alki Capital Management LLC ("Alki Capital") was the general partner of Alki Partners and the Investment Advisor of Alki Fund until in or around September 2008. In that capacity, Alki Capital managed the portfolios of Alki Partners and Alki Fund. Alki Capital's

---

[3] Alki Partners and Alki Fund shall sometimes be collectively referred to herein as the "Alki Entities."

principal, Scott Wilfong ("Wilfong"), made all investment decisions on behalf of Alki Partners and Alki Fund including the decision to purchase shares of RMDX.

30.     Wilfong was introduced to RMDX in or around April 2007 by Mark L. Moskowitz ("Moskowitz"), a stockbroker formerly employed by RBC Capital Markets Corp. ("RBC").

31.     In or around 2007, Moskowitz introduced Wilfong to Windhorst.  Windhorst informed Wilfong that Vatas was interested in purchasing large quantities of the common stock of RMDX. Thereafter, Windhorst instructed Wilfong to purchase large blocks of RMDX stock, with the understanding that Vatas would in turn purchase the shares of RMDX at a price equal to the average cost the Alki Entities paid for the stock, plus the amount of the transaction costs incurred in connection with the purchase of the stock, plus an additional $.05 to $.10 per share.

32.     Windhorst informed Wilfong that Vatas' broker was Ruiz at Credit Suisse and that Ruiz would be handling the trades between the Alki Entities and Vatas.  Windhorst claimed that Vatas could not itself purchase the shares in the open market, as its charter prevented it from doing so.

33.     Wilfong, in reliance on Windhorst's representations relating to Vatas' intent to purchase RMDX, caused the Alki Entities to purchase and accumulate large quantities of RMDX common stock with the expectation of selling those shares to Vatas in the manner that Windhorst had described.  Commencing in or around June 2007, the Alki Entities' purchases of RMDX often accounted for a substantial percentage of RMDX's reported volume for the day's reported trading volume.  Upon information and belief, transactions representing sales to Vatas through Credit Suisse were not reported in the daily volume.

34.     From in or around April 2007 to in or around February 2008, Wilfong caused the Alki Entities to purchase large quantities of RMDX stock for resale to Vatas.

35.     Upon information and belief, the defendants, specifically Hersov, Windhorst, Ogrisek and Vatas, knew that the active trading that they orchestrated would have a significant impact upon the market price for RMDX common stock.   By their conduct, creating and orchestrating a large amount of daily transactions in RMDX, the defendants intended the price of RMDX to rise.   Based on such conduct, the price of RMDX did rise.

36.     The transactions between the Alki Entities and Vatas were consistent with the terms that Windhorst had initially represented, and were effectuated through pre-arranged off-market trades which were agreed upon through communications between Wilfong and Windhorst. Typically, after Wilfong and Windhorst had arranged a trade, Wilfong would telephone Ruiz at Credit Suisse to advise him of the terms.   Ruiz would then telephone Windhorst to confirm the transaction, and would then place the instructions to accept the DVP of the RMDX shares sold by the Alki Entities through Credit Suisse.   Upon information and belief, other like transactions were effectuated for Vatas through Credit Suisse.

37.     All of the trades effectuated between the Alki Entities and Vatas were on a DVP basis, meaning that the Alki Entities, through their prime broker, Goldman Sachs & Co. ("Goldman Sachs"), would deliver the RMDX shares to Credit Suisse, and Credit Suisse was supposed to make payment for the shares delivered to Goldman Sachs upon receipt of the shares.

38.     In or around January and February 2008, Windhorst told Wilfong to increase the Alki Entities' purchases of RMDX for resale to Vatas. These purchases of RMDX stock accounted for a substantial portion of the total trading volume of RMDX.   On two occasions

(January 17 and 18, 2008, respectively), the Alki Entities' trading accounted for 67.21% and 60.82% of the total daily trading volume of RMDX, and on several other occasions, between January 31 and February 6, 2008, the trading accounted for upwards of 40% of the total daily volume.

39.    The Alki Entities were not the only entities through which Windhorst and Vatas were accumulating large quantities of RMDX stock.  As evidenced by a Schedule 13D filed by Nord LB and based upon reports on the Dow Jones Newswires on March 14, 2008, Windhorst and Vatas were also purchasing large quantities of RMDX stock through Nord LB.  According to Nord LB's Schedule 13D filing, between November 2007 and February 25, 2008, Nord LB purchased 31,024,000 shares of RMDX (representing 23.6% of RMDX's outstanding shares) on Vatas' behalf.

40.    The combined direct and indirect trading activity of Windhorst and Vatas of RMDX stock through the Alki Entities and Nord LB represented a substantial portion of the total trading volume of RMDX.  Such activity fostered and promoted by the defendants materially impacted the market prices for RMDX.  Indeed, the trading activity orchestrated by Windhorst and Vatas caused the price of RMDX to rise to a high of $4.24 on December 7, 2007, and based upon particularly heavy purchasing activity during that period, hovered at prices between $3.50 to $4.00 per share in January and early February.

41.    Upon information and belief, Vatas failed to disclose its true ownership of RMDX shares and warrants in its filings with the SEC.  Specifically, Vatas failed to disclose that it was acting in concert as a group with third parties and failed to disclose the ownership of RMDX shares held for its account by other third parties, including Nord LB.

11

42.     Upon information and belief, in early February 2008, Credit Suisse, recognizing its conduct in furtherance of the manipulation of RMDX had exposed Credit Suisse to risk of litigation, froze Vatas' investment account at Credit Suisse.  Prior to its freeze of Vatas' account, Credit Suisse, through defendant Ruiz, regularly advised Wilfong that the trades done with Windhorst for Vatas would settle and that Vatas had money to pay for the RMDX trades.  Ruiz' representations to Wilfong were false or made with reckless disregard for the truth; knowing that Plaintiffs would rely on such representations to Plaintiffs' detriment by continuing to purchase shares of RMDX on the OTC BB for delivery to Vatas through Credit Suisse.

43.     Ruiz did not advise Wilfong that Vatas' account had been frozen.   Wilfong continued to confirm DVP orders to sell RMDX to Vatas with Ruiz.  Notwithstanding continued assurances from Ruiz that the sales to Vatas would settle, Credit Suisse declined to accept delivery of these transactions, and the trades never settled.  Upon information and belief, these trades aggregate to approximately $21,000,000.

44.     During the week of February 11, 2008, due to the collapse of the manipulation caused by, amongst other events, Credit Suisse's refusal to settle the outstanding Vatas trades, the price of RMDX dropped sharply, to approximately $1.50 per share.

45.     Upon information and belief, Credit Suisse also failed to settle numerous Vatas trades to purchase RMDX stock from Nord LB.  As a consequence, as indicated by Nord LB's own Schedule 13D filing on March 14, 2008, Nord LB was compelled to assume ownership of a total of 31,024,000 shares of RMDX at a cost of $116,616,015.

46.     Nord LB filed an amended Schedule l3D on July 30, 2008, disclosing that it had contracted to sell these 31,024,000 shares to a Dr. Winfried Kill for the sum of €25,000,069.92, with payment due on August 29, 2008, for a loss of approximately $75,000,000.

47.     Upon information and belief, Vatas and those acting in concert with Vatas were not permitted to sell the shares they accumulated without complying with the volume limitation of SEC Rule 144.  Vatas and those acting in concert with Vatas violated such restrictions.

48.     Due to Credit Suisse's refusal to settle, sales proceeds of the sales by the Alki Entities were not realized. Goldman Sachs advised Wilfong that, in the absence of substantial cash deposits, it would liquidate the Alki Entities' accounts in order to meet their house margin requirements.

49.     As the Alki Entities' accounts were heavily concentrated in RMDX stock, the liquidation of the accounts would have caused a further decline in the share price of RMDX, and would have caused the Alki Entities to sustain even greater losses. Faced with these prospects, Wilfong agreed to cancel the broken trades that should have settled DVP at Credit Suisse, and the RMDX shares which had been delivered to Credit Suisse were returned to Goldman Sachs and deposited into the Alki Entities' accounts.

50.     Vatas and Windhorst have acknowledged Vatas' responsibility to the Alki Entities to honor the broken trades, and three (3) different written settlement agreements relating to the trades were executed by and between Vatas, Alki Partners, Alki Fund, and Alki Capital on February 29, 2008, May 13, 2008, and June 10, 2008.

51.    Pursuant to the June 10, 2008 agreement ("Settlement Agreement"), which supersedes each and all of the prior agreements, Vatas agreed to purchase 4,100,000 shares of RMDX from the Alki Entities for the aggregate price of $17,500,000. Specifically, Vatas agreed to purchase 2,477,916 shares of RMDX stock from Alki Partners for the sum of $10,274,284, and 1,622,084 shares from Alki Fund for the sum of $6,725,716. The purchase price was to be paid as follows:

(i)    $2,000,000 by June 10, 2008;

(ii)    $5,500,000 by June 30, 2008; and

(iii)    $10,000,000 by August 31, 2008.

52.    The $2,000,000 payment was made. Thereafter, purportedly as the result of its Credit Suisse account having been frozen, Windhorst advised Wilfong that Vatas was unable to comply with its payment obligations to the Alki Entities under the Settlement Agreement and Vatas failed to make the $5,500,000 payment which was due by June 30, 2008. Vatas has defaulted on the Settlement Agreement.

53.    Upon information and belief, Vatas was insolvent when it executed the Settlement Agreement on or about June 10, 2008.

54.    Thereafter, Windhorst made a proposal to Wilfong to "workout" Vatas' breach of the Settlement Agreement, requesting that the Alki Entities "warehouse" the 4,100,000 shares of RMDX stock. Windhorst and Vatas' workout proposal was in furtherance of an attempt to manipulate the market for RMDX stock and was rejected. Windhorst and Vatas have proposed to Wilfong that they form a special purpose vehicle ("SPV") to be funded with the Alki Entities' 4,100,000 shares, the 31,024,000 shares which Dr. Kill has contracted to purchase from Nord

14

LB, and a substantial amount of cash from undisclosed parties.   Windhorst further stated to Wilfong that the SPV would invest capital into RMDX in return for the company's issuance to the SPV of additional RMDX shares, at a discount.   Windhorst informed Wilfong that RMDX would then make public announcements whose purpose was to cause RMDX's stock price to rise, at which time the SPV would sell its inventory of RMDX stock into the newly created artificially inflated market.

55.   From the proceeds of this classic "pump and dump" market manipulation, Windhorst and Vatas proposed to pay to the Alki Entities the $17,500,000 that was owed.   For obvious reasons, the investors in each of Alki Partners and Alki Fund instructed Wilfong that the "workout" proposed by Windhorst and Vatas be rejected.

56.   Thereafter, the Alki Entities sold their shares of RMDX which resulted in an out-of-pocket loss in excess of $10,000,000.

### FIRST CAUSE OF ACTION
**(Against Defendants Hersov, Vatas, Windhorst, Ogrisek, Credit Suisse, and Ruiz for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b))**

57.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 56 above, as if the same were fully set forth herein.

58.   As specifically pled above, defendants Hersov, Vatas, Windhorst, Ogrisek and Ruiz manipulated the market for RMDX stock by engaging Wilfong and the Alki Entities, Nord LB, and others, to acquire large quantities of RMDX stock, for ultimate resale, through pre-arranged trades outside the market, to Vatas.

59.    The purchasing activity orchestrated by defendants caused the price of RDMX stock to artificially rise.

60.    At the time that defendants were manipulating the price of RMDX stock upward, they were directly and/or indirectly selling RMDX shares or intending to sell RMDX shares, at prices higher than they paid, into the artificial market demand they had created.

61.    Defendant Ruiz was a direct participant in Windhorst and Vatas' fraudulent manipulation of the market for RMDX stock in that he knowingly and willingly and/or recklessly, without regard for the consequences of his actions, placed and processed the pre-arranged outside of the market orders by which Vatas purchased RMDX stock from the Alki Entities and Nord LB, all in furtherance of the manipulation of the market for RMDX stock.

62.    In addition, as Vatas' broker, defendant Ruiz knew that Vatas was selling RMDX stock at the same time that Hersov, Windhorst, Ogrisek and Vatas were manipulating the price of the stock upward.

63.    Defendants Ruiz, Hersov, Windhorst, Ogrisek and Vatas artificially affected the market price of RMDX stock, with the intent to deceive the Alki Entities and the investing public.

64.    At all times relevant, the Alki Entities assumed, and relied upon, an efficient market for RMDX stock, and upon a market free of manipulation.

65.    Defendants' manipulation was achieved by, and was related to, the purchase and sale of securities, namely RMDX common stock.

66.     Defendants' market manipulation was effectuated through the use of a quotation service operated by FINRA in the United States.

67.     Prior to its freeze of Vatas' account, Credit Suisse, through defendant Ruiz, regularly advised Wilfong that the trades done with Windhorst for Vatas would settle and that Vatas had money to pay for the RMDX trades.  Ruiz' representations to Wilfong were false or made with reckless disregard for the truth; knowing that Plaintiffs would rely on such representations to Plaintiffs' detriment by continuing to purchase shares of RMDX on the OTC BB for delivery to Vatas through Credit Suisse.

68.     Defendant Credit Suisse is liable and responsible for the fraudulent conduct of defendant Ruiz under the doctrine of respondeat superior, and also based upon its failure to adequately supervise the activities of defendant Ruiz.

69.     Plaintiffs have suffered damages as a result of defendants' fraud in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**(Against Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse
for violations of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a))**

70.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 69 above, as if the same were fully set forth herein.

71.     Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse, by virtue of their position, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

72.     Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse had the power, influence and authority and exercised the same to cause Vatas and/or Ruiz to engage in the wrongful conduct and practices complained of herein.

73.     By reason of the conduct alleged in Count I of the Complaint, defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse are liable for the wrongful conduct alleged herein, and are liable to plaintiffs for the substantial damages which they suffered as a result of defendants' fraud in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (Against Defendants Windhorst, Ogrisek, Vatas, Ruiz and Credit Suisse for Common Law Fraud)

74.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 above, as if the same were fully set forth herein.

75.     Vatas is responsible for the fraudulent conduct of Windhorst and Ogrisek pursuant to *respondeat superior*.  Credit Suisse is responsible for the fraudulent conduct of Ruiz pursuant to *respondeat superior*.

76.     Plaintiffs have suffered damages as a result of defendants' fraud in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### (Against Defendant Vatas for Breach of Contract)

77.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 76 above, as if the same were fully set forth herein.

78.     Pursuant to the Settlement Agreement, Vatas agreed to purchase 4,100,000 shares of RMDX from the Alki Entities for the aggregate price of $17,500,000.  While Plaintiffs fully performed under the Settlement Agreement, Vatas breached the settlement agreement by failing to remit payment of $15,500,000.

79.     Plaintiffs have suffered damages as a result of Vatas' breach of the Settlement Agreement in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Against Defendant Sapinda for Veil Piercing)

80.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 79 above, as if the same were fully set forth herein.

81.     Upon information and belief, Sapinda was the sole shareholder of Vatas when Vatas executed the Settlement Agreement.

82.     Upon information and belief, Vatas was indebted to Nord LB in the amount of approximately $116,616,015 when the Settlement Agreement was executed.

83.     Upon information and belief, Vatas was insolvent when it executed the Settlement Agreement and failed to observe proper corporate formalities.

84.     Sapinda is responsible for payment on the Settlement Agreement and contracts entered into by Vatas when Vatas was insolvent.

85.     Plaintiffs have suffered damages as a result of Vatas' breach of the Settlement Agreement in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Against Defendants Hersov, Vatas, Windhorst, Ogrisek, Credit Suisse, and Ruiz for violations of § 21.20.010 of the Securities Act of Washington, <u>Wash. Rev. Code Ann. § 21.20.010 (2009))</u>

86.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 85 above, as if the same were fully set forth herein.

87.     As specifically pled above, defendants Hersov, Vatas, Windhorst, Ogrisek and Ruiz manipulated the market for RMDX stock by engaging Wilfong and the Alki Entities, Nord LB, and others, to acquire large quantities of RMDX stock, for ultimate resale, through pre-arranged trades outside the market, to Vatas.

88.     The purchasing activity orchestrated by defendants caused the price of RDMX stock to artificially rise.

89.     At the time that defendants were manipulating the price of RMDX stock upward, they were directly and/or indirectly selling RMDX shares or intending to sell RMDX shares, at prices higher than they paid, into the artificial market demand they had created.

90.     Defendant Ruiz was a direct participant in Windhorst and Vatas' fraudulent manipulation of the market for RMDX stock, in that he knowingly and willingly and/or recklessly, without regard for the consequences of his actions, placed and processed the pre-arranged outside of the market orders by which Vatas purchased RMDX stock from the Alki Entities and Nord LB, all in furtherance of the manipulation of the market for RMDX stock.

91.     In addition, as Vatas' broker, defendant Ruiz knew that Vatas was selling RMDX stock at the same time that Hersov, Windhorst, Ogrisek and Vatas were manipulating the price of the stock upward.

92.     Defendants Ruiz, Hersov, Windhorst, Ogrisek and Vatas artificially affected the market price of RMDX stock, with the intent to deceive the Alki Entities and the investing public.

93.     At all times relevant, the Alki Entities assumed, and relied upon, an efficient market for RMDX stock, and upon a market free of manipulation.

94.     Defendants' manipulation was achieved by, and was related to, the purchase and sale of securities, namely RMDX common stock.

95.     Defendants' market manipulation was effectuated through the use of a quotation service operated by a national securities exchange.

96.     Defendant Credit Suisse is liable and responsible for the fraudulent conduct of defendant Ruiz under the doctrine of respondeat superior, and also based upon its failure to adequately supervise the activities of defendant Ruiz.

97.     Plaintiffs have suffered damages as a result of defendants' fraud in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Against Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse for violations of § 21.20.430(3) of the Securities Act of Washington, <u>Wash. Rev. Code Ann. § 21.20.430(3) (2009))</u>

98.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 97 above, as if the same were fully set forth herein.

99.     Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse, by virtue of their position, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 21.20.430(3) of the Securities Act of Washington, Wash. Rev. Code Ann. § 21.20.430(3) (2009).

100.    Defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse had the power, influence and authority and exercised the same to cause Vatas and/or Ruiz to engage in the wrongful conduct and practices complained of herein.

101.    By reason of the conduct alleged in Count VI of the Complaint, defendants Windhorst, Ogrisek, Sapinda, Hersov and Credit Suisse are liable for the wrongful conduct alleged herein, and are liable to plaintiffs for the substantial damages which they suffered as a result of defendants' fraud in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### <u>(Against Defendants for Civil Conspiracy)</u>

102.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 101 above, as if the same were fully set forth herein.

103.    Defendants Hersov, Sapinda, Vatas, Windhorst, Ogrisek and Ruiz planned to, agreed to, and did manipulate the market for RMDX stock by, amongst other things, engaging

Wilfong and the Alki Entities, Nord LB, and others, to acquire large quantities of RMDX stock, for ultimate resale, through pre-arranged trades outside the market, to Vatas.

104.    As specifically plead above, Defendants Hersov, Sapinda, Vatas, Windhorst, Ogrisek and Ruiz each engaged in overt acts in furtherance of the conspiracy.

105.    Plaintiffs have suffered damages as a result of defendants' conspiracy in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### (Against Defendants for violations of § 19.86.020 of the
### Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.020 (2009))

106.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 105 above, as if the same were fully set forth herein.

107.    Defendants engaged in unfair or deceptive acts or practices when they manipulated the market for RMDX stock by engaging Wilfong and the Alki Entities, Nord LB, and others, to acquire large quantities of RMDX stock, for ultimate resale, through pre-arranged trades outside the market, to Vatas.

108.    Defendants' unfair or deceptive acts or practices occurred in defendants' trade or business.

109.    Defendants' unfair or deceptive acts or practices impact the public interest as plaintiffs and other market participants rely on an efficient market for RMDX stock, and upon a market free of manipulation.

110.    By virtue of defendants' violations of § 19.86.020 of the Washington Consumer Protection Act, plaintiffs are entitled to attorneys' fees as provided by § 19.86.090 of the Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.090 (2009).

111.    As a direct and proximate cause of defendants' unfair or deceptive acts or practices, plaintiffs have suffered actual damages to their business and property in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of Plaintiffs and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

B.    Awarding Plaintiffs its reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

C.    Awarding Plaintiffs prejudgment interest.

D.    Awarding Plaintiffs punitive damages.

E.    Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 19, 2010

GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC

By: _____

Martin H. Kaplan (MK 6258)
Robert L. Herskovits (RH 2586)
Attorneys for Plaintiffs
120 Wall Street
New York, NY 10005
(212) 269-1400
(212) 809-5449 – fax
mkaplan@gkblaw.com
rherskovits@gkblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the First Amended Complaint was with the Court on February 19, 2010 for service via ECF upon:

Michael T. Sullivan, Esq., Counsel for Credit Suisse Group AG

Stuart A. Krause, Esq., Counsel for Frederic Ruiz.

A copy of the First Amended Complaint was served via overnight courier upon:

James A. Beha, Esq.
Allegaert Berger & Vogel LLP
111 Broadway, 20th Floor
New York, NY 10006
Counsel for Lars Windhorst, Peter A. Ogrisek,
Sapinda International, Ltd. And Robert B. Hersov

ROBERT L. HERSKOVITS