UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                              :

ALKI PARTNERS, L.P. and ALKI FUND, LTD.,  :

                                  :

             Plaintiffs,    :

                                  :

        -against-    :      09 CIV 8125 (DAB)

                                  :

VATAS HOLDING GMBH, LARS    :
WINDHORST, PETER A. OGRISEK, SAPINDA  :
INTERNATIONAL LTD., ROBERT B. HERSOV, :
CREDIT SUISSE GROUP AG, and FREDERIC  :
RUIZ,                              :

                                  :

             Defendants.  :
---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION BY LARS WINDHORST, PETER A. OGRISEK,
## ROBERT B. HERSOV AND SAPINDA INTERNATIONAL LTD.
## TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Christopher Allegaert
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

Attorneys for Defendants Lars Windhorst,
Peter A. Ogrisek, Robert B. Hersov and
Sapinda International Ltd.

Page(s)

## Table of Contents

Table of Authorities ................................................................................................ iv

Preliminary Statement............................................................................................... 1

Factual Background (As Alleged) ............................................................................. 3

    1.    Market Manipulation and the "Broken Trades"....................................... 3

    2.    The Posture of These Plaintiffs................................................................ 5

    3.    The "Broken Trade" Was Then Superseded By New, Written
        Contracts Which Contained Both Releases and a Covenant-Not-
        to-Sue ....................................................................................................... 6

Argument .................................................................................................................. 7

POINT I

    ALL CLAIMS AGAINST THE MOVING DEFENDANTS SHOULD BE
    DISMISSED FOR LACK OF PERSONAL JURSIDICTION ......................... 8

A.    PLAINTIFFS' CLAIMS AGAINST OGRISEK, HERSOV AND
    SAPINDA MUST BE DISMISSED BECAUSE THIS COURT LACKS
    PERSONAL JURISDICTION OVER THEM WITH RESPECT TO
    SUCH CLAIMS............................................................................................ 10

    1.    Ogrisek and Hersov Have Insufficient Contacts With the Forum to
        Warrant this Court's Exercise of Personal Jurisdiction Over Them ................... 10

    2.    Sapinda Has Insufficient Contacts With the Forum to
        Warrant this Court's Exercise of Personal Jurisdiction Over It ........................... 13

    3.    The Reasonableness Inquiry ......................................................................... 15

B.    PLAINTIFFS' CLAIMS AGAINST WINDHORST SHOULD ALSO BE
    DISMISSED BECAUSE THIS COURT LACKS PERSONAL
    JURISDICTION OVER HIM WITH RESPECT TO PLAINTIFFS'
    CLAIMS ...................................................................................................... 15

    1.    Windhorst Has Insufficient Contacts With the Forum to Warrant
        the Exercise of Personal Jurisdiction Over Him on Plaintiffs'
        Claims ....................................................................................................... 15

Page(s)

2.    Even Assuming, *Arguendo*, that Windhorst Has Sufficient
Contacts with the United States, It Would Be Unreasonable for the
Court to Exercise Personal Jurisdiction Over Him .............................. 17

C.    IN THE ABSENCE OF PERSONAL JURISDICTION ON THE
FEDERAL SECURITIES CLAIMS, PLAINTIFFS' REMAINING
STATE LAW CLAIMS AGAINST THE MOVING DEFENDANTS
SHOULD ALSO BE DISMISSED ............................................................. 18

POINT II

IN THE EVENT THE COMPLAINT WERE NOT DISMISSED AS TO
A MOVING DEFENDANT FOR LACK OF PERSONAL
JURISDICTION, THE RELEASE WOULD STILL REQUIRE
DISMISSAL OF ALL OF PLAINTIFFS' CLAIMS AGAINST SUCH
MOVING DEFENDANT ........................................................................... 19

A.    THE RELEASE IS VALID AND ENFORCEABLE ...................................... 19

B.    PLAINTIFFS HAVE RATIFIED THE RELEASE BY AFFIRMING THE
FINAL CONTRACT ................................................................................. 22

C.    IF PLAINTIFFS HAVE A "VEIL-PIERCING" CONTRACT CLAIM
AGAINST SAPINDA DESPITE THE RELEASE, THAT CLAIM MUST
BE DISMISSED FOR LACK OF JURISDICTION ....................................... 23

POINT III

THE COMPLAINT FAILS TO STATE A SECURITIES LAW CLAIM
AGAINST ANY MOVING DEFENDANT BECAUSE PLAINTIFFS
COULD NOT RELY ON THE SUPPOSED INTEGRITY OF A
MARKET *THEY* WERE MANIPULATING AND PLAINTIFFS WERE
NOT MISLED BY ANY MOVING DEFENDANT ....................................... 24

A.    AS THE IN PARI DELICTO PERPETRATORS OF THE ALLEGED
FRAUD ON THE OTCBB MARKET, PLAINTIFFS ARE NOT
ENTITLED TO INVOKE THE FEDERAL SECURITIES LAWS ................... 24

B.    AS THE PERPETRATORS OF THE ALLEGED FRAUD ON THE
OTCBB MARKET, PLAINTIFFS CANNOT ESTABLISH
"REASONABLE RELIANCE" ON THAT MARKET OR CLAIM
DAMAGES BASED ON THE DROP IN THE OTCBB MARKET PRICE
THAT OCCURRED WHEN THEIR MANIPULATION STOPPED ............. 26

C.    PLAINTIFFS DO NOT OTHERWISE STATE A FEDERAL
SECURITIES CLAIM AGAINST ANY MOVING DEFENDANT ............... 27

Page(s)

1.   Plaintiffs' Federal Securities Claims Against Ogrisek, Hersov and
     Sapinda Should be Dismissed Because the Complaint Contains No
     Specific Allegations Against Them ................................................................... 27

2.   Plaintiffs' Federal Securities Claims Against Windhorst Should be
     Dismissed Because Plaintiffs Have Not Sufficiently Pleaded Any
     Misrepresentation or Actionable Omission By Him Causing Their
     Losses................................................................................................................. 29

CONCLUSION......................................................................................................... 31

Page(s)

Table of Authorities

Cases

ATSI Communications, Inc. v. Shaar Fund,
493 F.3d 87 (2d Cir. 2007)................................................................26, 27, 28, 29

Ball v. Metallurgie Hoboken-Overpel, S.A.,
902 F.2d 194 (2d Cir. 1990)..........................................................................8

Bateman Eichler, Hill Richards, Inc. v. Berner,
472 U.S. 299 (1985)....................................................................................25

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007).....................................................................................29

Bersch v. Drexel Firestone, Inc.,
519 F.2d 974 (2d Cir. 1975)..........................................................................13

Calder v. Jones,
465 U.S. 783 (1984)......................................................................................9

Charas v. Sand Tech. Sys. Int'l, Inc.,
No. 90 Civ. 5638, 1992 WL 296406 (S.D.N.Y. 1992) ..........................................10, 13

Chemical Bank v. Arthur Andersen & Co.,
726 F.2d 930 (2d Cir. 1984)...........................................................................27

Chiarella v. U.S.,
445 U.S. 222 (1980)......................................................................................24

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991).............................................................................6

Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,
135 F.3d 837 (2d Cir. 1998)...........................................................................28

DiVittorio v. Equidyne Extractive Indus., Inc.,
822 F.2d 1242 (2d Cir. 1987)..........................................................................28

Dodge Street, LLC v. Livecchi,
32 Fed.Appx. 607 (2d Cir. 2002) .....................................................................22

Elliot Assoc., L.P. v. Hayes,
141 F.Supp.2d 344 (S.D.N.Y. 2000), aff'd, 26 Fed.Appx. 83 (2d Cir. 2002) ..............30

Page(s)

FDIC v. Milken,
781 F.Supp. 226 (S.D.N.Y. 1991) ................................................................................. 9, 13

Finkle v. Lasher,
178 A.D. 471, 165 N.Y.S. 141 (3d Dep't 1917) ............................................................. 23

Gurary v. Winehouse,
190 F.3d 37 (2d Cir. 1999) ............................................................................................ 26

H&H Acquisition Corp. v. Fin. Intranet Holdings,
No. 98 Civ. 5269, 2009 WL 3496826 (S.D.N.Y. 2009) ................................................ 22

Huang v. Sentinel Gov't Securities,
657 F.Supp. 485 (S.D.N.Y. 1987) ............................................................................... 9, 13

In re Parmalat,
376 F.Supp.2d 449 (S.D.N.Y. 2005) .............................................................................. 12

In re Rhodia S.A. Securities Litg.,
531 F.Supp.2d 527 (S.D.N.Y. 2007) ........................................................................ 10, 12

In re Ski Train Fire in Kaprun, Austria,
230 F.Supp.2d 403 (S.D.N.Y. 2002) .............................................................................. 14

International Shoe Co. v. Washington,
326 U.S. 310 (1945) ....................................................................................................... 17

Jazini v. Nissan Motor Co.,
148 F.3d 181 (2d Cir. 1998) ........................................................................................ 8, 14

JLB Equities, Inc. v. Ocwen Fin. Corp.,
131 F.Supp.2d 544 (S.D.N.Y. 2001) .............................................................................. 14

Keeton v. Hustler Magazine, Inc.,
465 U.S. 770 (1984) ....................................................................................................... 10

Kelter v. Apex Equity Options Fund, L.P.,
No. 08 Civ. 2911, 2009 WL 2599607 (S.D.N.Y. 2009) ................................................ 19

Krumme v. Westpoint Stevens Inc.,
238 F.3d 133 (2d Cir. 2000) ........................................................................................... 21

Leasco Data Processing Equip. Corp. v. Maxwell,
468 F.2d 1326 (2d Cir. 1972) ...................................................................................... 9, 17

Page(s)

Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,
558 F.2d 1113 (2d Cir. 1977)..........................................................................22

Luce v. Edelstein,
802 F.2d 49 (2d Cir. 1986)..............................................................................30

McLean v. Balkoski,
125 A.D.2d 234, 509 N.Y.S.2d 34 (1st Dep't 1986) .......................................23

Medtech Products Inc. v. Ranir, LLC,
596 F.Supp.2d 778 (S.D.N.Y. 2008)...............................................................21

Metropolitan Life Ins. Co. v. Robertson-CECO Corp.,
84 F.3d 560 (2d Cir. 1996)........................................................... 8, 9, 15, 18

Miller v. Lazard, Ltd.,
473 F.Supp.2d 571 (S.D.N.Y. 2007)...............................................................28

Mills v. Polar Molecular Corp.,
12 F.3d 1170 (2d Cir. 1993).............................................................................29

Murray v. Xerox Corp.,
811 F.2d 118 (2d Cir. 1987).............................................................................30

Napolitano v. City of New York,
12 AD.3d 194, 783 N.Y.S.2d 584 (1st Dep't 2004) .......................................22

Peltz v. SHB Commodities, Inc.,
115 F.3d 1082 (2d Cir. 1997)...........................................................................25

Perma Research and Development Co. v. Singer Co.,
410 F.2d 572 (2d Cir. 1969).............................................................................30

Pinter v. Dahl,
486 U.S. 622 (1988).........................................................................................25

Powell v. Omnicom,
497 F.3d 124 (2d Cir. 2007).............................................................................19

Psenicska v. Twentieth Century Fox Film Corp.,
No. 07 Civ. 10972, 2008 WL 4185752 (S.D.N.Y. 2008) ...............................21

Rivera v. New York,
115 A.D.2d 431, 496 N.Y.S.2d 230 (1st Dep't 1985) .....................................20

Page(s)

Ross v. Bolton,
904 F.2d 819 (2d Cir. 1990)..................................................................... 25

Ruskay v. Waddell,
552 F.2d 392 (2d Cir. 1977)..................................................................... 22

Ryan v. Allen,
No. 97 Civ. 0055, 1997 WL 567717 (S.D.N.Y. 1997) ............................. 13

S.E.C. v. Unifund,
910 F.2d 1028 (2d Cir. 1990).................................................................... 16

Schenker v. Assicurazioni Generali S.P.A.,
No. 98 Civ. 9186, 2002 WL 1560788 (S.D.N.Y. 2002) ............................ 14

Scone Investments, L.P. v. American Third Market Corp.,
No. 97 Civ. 3802 (SAS), 1998 WL 205338 (S.D.N.Y. 1998)............................ 26, 28

United Mine Workers of America v. Gibbs,
383 U.S. 715 (1966)................................................................................. 18

Volkswagenwerk AG v. Beech Aircraft Corp.,
751 F.2d 117 (2d Cir. 1984)...................................................................... 14

Willgerodt v. Hohri,
953 F.Supp. 557 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998)................................... 19

World-Wide Volkswagen Corp. v. Woodson,
444 U.S. 286 (1980)................................................................................. 18

Statutes

15 U.S.C. § 78u-4(b)(1) ................................................................. 24, 27, 28, 29

Fed. R. Civ. P. 9(b) ...................................................................................... passim

Fed. R. Civ. P. 12(b)(2)................................................................................. 1, 8

Fed. R. Civ. P. 12(b)(6)................................................................................. 1, 29

Defendants Lars Windhorst ("Windhorst"), Peter A. Ogrisek ("Ogrisek"), Robert B. Hersov ("Hersov") and Sapinda International Ltd. ("Sapinda") (together, the "Moving Defendants") submit this Memorandum in support of their motion to dismiss the First Amended Complaint (the "Complaint") of plaintiffs Alki Partners, L.P. ("Alki Partners") and Alki Fund, Ltd. ("Alki Fund") (together, "Plaintiffs" or "the Funds"), pursuant to Fed. R. Civ. P. 12(b)(2) and (6) as well as Fed. R. Civ. P. 9(b).

## Preliminary Statement

This case involves a straightforward contract claim ("you were supposed to buy this stock from me, and you didn't, so I lost money") framed in an unsavory setting. The Funds allege that they were manipulating the U.S. market for a particular thinly-traded stock on the "understanding" that the shares thus purchased could be laid off at a guaranteed profit to Vatas Holding GmbH ("Vatas"), a company in Germany, through a bank in Switzerland, and that after the Funds profitably flipped such stock to Vatas on several occasions the bank shut the gate, leaving the Funds with millions of shares of stock that they had bought at prices *they* had inflated and which they had expected to mark-up and then lay off to Vatas.[1]  Plaintiffs have gone to great length to dress up their collection case against Vatas as a Section 10(b) securities claim, in an effort to obtain personal jurisdiction in this Court over the "pockets" of additional defendants who were not parties to the repurchase contracts (Vatas itself being in bankruptcy in Germany) and in an effort to manufacture subject matter jurisdiction in this Court, when there clearly would not be jurisdiction over the only contract claims that Plaintiffs might actually have.

As to the Moving Defendants (which include three parties with whom the Funds admittedly never dealt at any time), these efforts fail completely, for three reasons:

---

[1] Defendants stress that for purposes of this motion they are crediting the allegations of the Complaint, as the Court must, and in no way implying that they accept Plaintiffs' version of the events.

First, despite all the securities law costuming and grease paint, the Complaint does not provide a basis for asserting personal jurisdiction over any of the Moving Defendants. Plaintiffs provide not even a whiff of a jurisdictional basis for pursuing Ogrisek, Hersov and Sapinda here, and, while Plaintiffs do at least make an effort to plead jurisdiction over Windhorst, what they plead does not establish personal jurisdiction over him on the claims *these Plaintiffs* attempt to assert.

Second, in the June 10, 2008, contract that concluded the Funds' business dealings with Vatas, Plaintiffs *expressly released* the very claims against the Moving Defendants which they now attempt to plead. Plaintiffs plead the existence of this "settlement agreement" in Complaint ¶ 51, affirm that this agreement "supersedes each and all of the prior agreements," admit to collecting $2 million from Vatas based on this agreement (Compl. ¶ 52), and sue for damages based on the remaining amounts due from Vatas under this contract (id. ¶¶ 77-85) – all without revealing the release and covenant-not-to-sue contained in that agreement (infra, p. 20).[2]

Third, Plaintiffs' attempt to turn *their* claims about not collecting from Vatas for the last round of stock they had expected Vatas to take off their hands into a Section 10(b) claim must fail, and not merely because it does not meet the pleading standards of Rule 9(b) and federal law. This is not a case brought by the *victims* of market manipulation, but a claim brought by the manipulators themselves, who are upset with their alleged co-conspirators only because in the end their market manipulation went sour. Plaintiffs cannot claim that they reasonably relied on an efficient market in purchasing the stock in question when *they* were

---

[2]   There is one (and only one) claim against the Moving Defendants that arguably is not barred by the release – the breach of contract claim against Sapinda based on a veil-piercing theory – and that claim would still be barred by the related covenant-not-to-sue also contained in the settlement agreement (infra, p. 23). However, with the federal securities law claims against Sapinda barred by the release, there plainly would remain neither subject matter jurisdiction over that "veil-piercing" claim in this Court nor grounds for asserting personal jurisdiction over Sapinda in this Court, and so the question of whether this claim might survive need not be reached by the Court (id.).

manipulating that market; Plaintiffs are not entitled to bring a securities law claim premised on

their own market manipulation; and Plaintiffs have not otherwise alleged any actionable

misrepresentation by any Moving Defendants in connect with Plaintiffs' failed sales to Vatas.

### Factual Background (As Alleged)

1.   Market Manipulation and the "Broken Trades"

This case arises from a series of transactions in 2007-08 between Plaintiffs, two

"hedge funds engaged in the purchase and sale of securities" (Compl. ¶ 28), and Vatas[3] involving

the shares of a company named RemoteMDx, Inc. ("RMDX"), which shares are traded on the

U.S. over-the-counter bulletin board market (the "OTCBB Market") (id. ¶ 18).  Plaintiffs allege

that, in addition to their own substantial position in RMDX stock (comprising the bulk of their

own portfolio (id. ¶ 49)), the Funds proceeded to "purchase and accumulate large quantities" of

RMDX shares on the OTCBB Market in "the expectation" that, through "DVP" presentation at

Credit Suisse Group AG in Zurich ("Credit Suisse"), Vatas would later purchase such shares

from the Funds at a marked-up price, ensuring large profits for the Funds (id. ¶¶ 31-33).[4]

According to Plaintiffs, this "understanding" was based on oral discussions with Windhorst as an

officer of Vatas (id. ¶¶ 31-33, 38); Plaintiffs do not identify any written evidence of this alleged

understanding and do not specify *any* direct contact between Plaintiffs and Ogrisek, Hersov or

Sapinda with respect to any aspect of this scheme.

---

[3] Vatas is a "private limited liability company organized under the laws of Germany with a principal office located at Friedrichstrasse 95, 10117, Berlin, Germany" (Compl. ¶ 11).  Vatas is currently in bankruptcy proceedings in Germany.  Declaration of Christopher Allegaert dated March 5, 2010, submitted herewith ("Allegaert Decl.") ¶ 5.  Although Plaintiffs have filed an affidavit of service asserting that Vatas was served in Germany, Vatas has not appeared in this proceeding.

[4] According to Plaintiffs, the stock Plaintiffs bought in manipulating the OTCBB Market could be later sold at a mark-up to Vatas in off-market transactions, on a delivery-versus-payment ("DVP") basis, meaning that payments for the RMDX shares were made to Plaintiffs by Credit Suisse in Switzerland upon Plaintiffs' delivery of the RMDX shares through an intermediary (Goldman Sachs) to Credit Suisse in Switzerland (Compl. ¶¶ 31, 36-37).  It would appear that sometimes the Funds kept RMDX shares for their own accounts, since at Goldman "the Alki Entities accounts were heavily concentrated in RMDX stock" (id. ¶ 49).

The Complaint alleges that on a number of occasions the Funds did successfully sell RMDX shares that they had accumulated to Vatas, through tender at Credit Suisse, at a profit of "an additional $.05 to $.10 per share" (id. ¶ 31), on what apparently were many millions of shares (id. ¶¶ 34-38).

According to the Complaint, the Funds' purchases of RMDX stock on the OTCBB Market, bolstered by the expectation that they could later "put" RMDX shares to Vatas in an "off-market" private transaction in Switzerland at a guaranteed profit, were undertaken with the deliberate intention of manipulating the pricing of RMDX stock on the OTCBB Market. This campaign came to an abrupt halt when Credit Suisse refused to settle trades presented by the Funds in February 2008 because Credit Suisse had decided to freeze the Vatas investment account (the "Broken Trade") (id. ¶¶ 42-43). The Funds thereafter made the business decision to "cancel the broken trades that should have settled DVP at Credit Suisse" and to reclaim the RMDX shares they had tendered to Credit Suisse so that these could be deposited into the Funds' margin account at Goldman Sachs, to avoid a threat by Goldman that, "in the absence of substantial cash deposits, it would liquidate the Alki Entities accounts in order to meet their house margin requirements" (id. ¶¶ 48-49).[5]

After reclaiming their Broken Trade stock from Credit Suisse, the Funds entered into a series of "settlement agreements" with Vatas (id. ¶ 51) (the "New Contracts").[6] In the last of these, Vatas agreed to pay the Funds $2,000,000 as part of purchasing certain RMDX shares

---

[5]  Plaintiffs allege that the OTCBB market price for RMDX shares subsequently fell sharply "due to the collapse of the manipulation" (Compl. ¶ 44); since Plaintiffs acknowledge that these trades were not reported on the OTCBB, what Plaintiffs plainly mean is that the OTCBB market price fell sharply once *Plaintiffs* stopped their manipulation of that market. In this, we submit, Plaintiffs are effectively admitting that when they eventually sold the "broken trade" stock back into the market at a lower, true-market price, the loss Plaintiffs suffered versus the earlier, inflated price was the product of their own wrong-doing!

[6]  In this action Plaintiffs sue upon, and thereby affirm, these contracts (Compl. ¶¶ 77-85) (infra, pp. 22-23). Although Plaintiffs do not attach the New Contracts to the Complaint, the Court may treat them as incorporated by reference for purposes of a motion to dismiss (infra, p. 6). These documents are at Allegaert Decl. Exhibits 1-3.

from them; for their part, effective upon signing, the Funds *released* Vatas and its affiliates and other related persons from *any and all other claims* directly or indirectly related to the Funds' RMDX shares, a fact about these admittedly "superseding" contracts that Plaintiffs fail to mention in the Complaint (infra, p. 20). Vatas paid the Funds the entire $2,000,000, but eventually defaulted on the additional payments due under the last of these agreements. The Funds later sold the RMDX shares covered by the New Contracts for "an out-of-pocket loss in excess of $10,000,000," which they no doubt are measuring using the previously inflated prices of RMDX, a loss that was the self-inflicted result of their own market manipulation (Compl. ¶ 56).

      2.    The Posture of These Plaintiffs

      Plaintiffs thus allege that they intentionally implemented a manipulative trading scheme, aiming to artificially inflate or support the price of RMDX stock in the OTCBB Market (id. ¶¶ 33-34), so as to "artificially inflate the price of the RMDX shares with the intent to reap profits" (id. ¶ 4). While Plaintiffs imply that Vatas and the Moving Defendants were the ones seeking to reap such profits, Plaintiffs do not identify *any* instance in which Vatas or any other defendant sold RMDX stock at the supposedly inflated price in any US market or to any US person. At the same time, Plaintiffs concede that the Funds had *their own* large position in RMDX stock – in fact, it comprised the bulk of their own portfolio (id. ¶ 49) – and Plaintiffs acknowledge that the reported market price of RMDX stock affected their own margin account requirements (id. ¶¶ 48-49). Since "the Alki Entities accounts were heavily concentrated in RMDX stock" (id.), a scheme that would "artificially inflate the price of the RMDX shares" (id. ¶ 4) was to *the Funds'* own financial advantage, and the Funds profited as well from the mark-ups they obtained when they elected to lay off their accumulated "large blocks of RMDX stock"

to Vatas. Plaintiffs do not plead in any coherent way how *they* might be classified as a *victim* of the OTCBB manipulation they allegedly spearheaded, rather than as a profiteer.

3.    <u>The "Broken Trade" Was Then Superseded By New, Written Contracts
Which Contained Both Releases and a Covenant-Not-to-Sue</u>.

According to Plaintiffs, after the Funds reclaimed the RMDX stock from the "Broken Trade," the Funds and Vatas entered into three successive "settlement agreements" (on February 29, 2008, May 13, 2008 and June 10, 2008), with the third such agreement (the "Final Contract") becoming the operative document for present purposes (<u>id.</u> ¶¶ 50-51). The Complaint, and the New Contracts themselves (each of which says that it "supersedes all prior and contemporaneous agreements, express or implied, oral or written") make clear that these New Contracts were a novation for the parties, a newly negotiated written contract replacing all their prior "understandings."[7]

The Court can see from the documents that the various New Contracts differed on some business terms (the first two involved a complex put-and-call structure whereas the Final Contract is more straight-forward). However, each New Contract, including the Final Contract, contains a release provision ("Release") discharging Vatas and other "Released Persons" (as defined therein) from "all claims and obligations directly *or indirectly* related to the [broken trades] . . ., which release shall apply to all Released Persons and shall be effective upon signing this Agreement" (Final Contract § 5, emphasis added).[8] To this Release was also added a

---

[7] Since the very first of these New Contracts "supersedes all prior...agreements, express or implied, oral or written," it is clear that these agreements supersede or "settle" the Broken Trade, and they say as much.

[8] On a motion to dismiss, it is proper for the Court to consider the entire contract document (including the Release contained therein), which was referenced in the Complaint and relied upon by Plaintiffs in pleading a cause of action. <u>See</u> <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991) (in motion to dismiss securities fraud claim, court may rely on stock purchase agreement and other documents which plaintiffs had either in their possession or had knowledge of and upon which they relied in bringing suit, even though such documents were not attached as exhibits to complaint nor incorporated by reference in it).

covenant not to sue any Released Person on any related claim, excluding only a suit against Vatas (as a defined "Party") for violation of the Final Contract (Final Contract § 4(a)).

By entering into these New Contracts Plaintiffs obtained a written agreement with fixed financial terms to replace what they assert was an oral and undocumented understanding, and Plaintiffs acknowledge that the payment of $2,000,000 was made by Vatas and accepted by Plaintiffs (Compl. ¶ 52).[9]  Plaintiffs do not allege that Vatas or any Moving Defendant made any misrepresentations of any kind to them in connection with these "superseding" New Contract transactions.  Plaintiffs do allege that by the time of the third, the June 10, 2008, New Contract, Vatas was "insolvent" (id. ¶ 53).  However, they do not allege that any misrepresentation was made to them by any Moving Defendant in this regard, or that any Moving Defendant had a legal obligation to disclose this alleged fact.[10]

### Argument

Although it would seem clear that all but perhaps one of Plaintiffs' claims against the Moving Defendants are barred by the Release, we start with the topic of personal jurisdiction over the Moving Defendants on the supposed federal securities claims, since in the absence of such jurisdiction there is no reason to consider the effect of the Release.  The Moving

---

[9]  Although Plaintiffs admit that they received the $2,000,000 due on June 10 under the Final Contract (Compl. ¶ 52), it would appear that Plaintiffs received a total of $3,000,000 in all by entering into the New Contracts, because the Final Contract recites that a separate $1,000,000 had already been paid in March (the Complaint is silent about this additional $1,000,000).

[10]  Plaintiffs could not possibly have been surprised by Vatas being in precarious financial condition as of June 2008, since (i) Plaintiffs knew that the Vatas account at Credit Suisse was frozen; (ii) one can see from reading the New Contracts in sequence that Vatas had only partially performed its financial obligations under the first "settlement agreement," resulting in the negotiation of "superseding" agreements in which later payment dates were set; and (iii) well before June 10, 2008 (when the Final Contract was signed), Nord LB had filed a Schedule 13D concerning the failure of Vatas to pay Nord LB for a far larger block of RMDX stock (Compl. ¶¶ 42, 45).  Given the March 14, 2008, date of the Nord LB filing, moreover, Plaintiffs cannot claim that they were unaware of Vatas' dealings through Nord LB at the time Plaintiffs entered into the Final Contract (or its immediate predecessor, dated in May 2008, for that matter) – and Plaintiffs do not make any such claim.  Indeed, the fact that after two re-negotiations of payment terms the Final Contract still calls for payment over time, rather than all at once, inevitably indicates that Plaintiffs knew Vatas would have to try to raise the cash from third parties.

Defendants then address the Release, which plainly bars the federal securities claims Plaintiffs now plead (as well as other claims). For completeness, in Point III the Moving Defendants address the numerous deficiencies in Plaintiffs' attempted pleading of a Section 10(b) claim against them with respect to Plaintiffs' OTCBB Market manipulations and their "off-market" transactions with Vatas.

We focus on the federal securities claims because it is facially obvious that in the absence of such claims this Court would have neither subject matter jurisdiction over any remaining claims nor personal jurisdiction over any Moving Defendant.[11]

## POINT I

### ALL CLAIMS AGAINST THE MOVING DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURSIDICTION.

On a Rule 12(b)(2) motion, a plaintiff bears the burden of showing that the court has personal jurisdiction over the moving defendants. Metropolitan Life Ins. Co. v. Robertson-CECO Corp., 84 F.3d 560, 566 (2d Cir. 1996); a plaintiff must establish "a *prima facie* showing of jurisdiction." Ball v. Metallurgie Hoboken-Overpel, S.A., 902 F.2d 194, 197 (2d Cir. 1990). Prior to discovery, the plaintiff's *prima facie* showing of jurisdiction may be established by *factual* allegations in its complaint, which are assumed to be true for purposes of the motion. Id. However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation," and "conclusory non-fact-specific jurisdictional allegations" do not establish a *prima facie* showing of jurisdiction. Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir. 1998).

Where claims are brought under the Securities Exchange Act of 1934 (the "Exchange Act"), personal jurisdiction may be exercised to the full extent permitted by the Due

---

[11] In the First Amended Complaint Plaintiffs deleted their prior allegation of diversity jurisdiction over the state law claims. The Complaint contains no allegation of any kind that would support personal jurisdiction under the New York CPLR or otherwise with respect to the contract and other common law claims.

Process Clause, <u>Leasco Data Processing Equip. Corp. v. Maxwell</u>, 468 F.2d 1326, 1340 (2d Cir. 1972), and the due process inquiry comprises a two-step analysis: (a) the "minimum contacts" test; and (b), if necessary, a "reasonableness" inquiry.  The minimum contacts test determines whether the defendant has sufficient contacts with the forum to justify the court's exercise of jurisdiction.  <u>Metropolitan Life</u>, 84 F.3d at 567.[12]  If there are sufficient minimum contacts, a reasonableness inquiry is undertaken to determine whether the exercise of personal jurisdiction "is reasonable under the circumstances of the particular case."  <u>Id.</u> at 568.

   An important distinction is made between "general" and "specific" jurisdiction. <u>Id.</u> at 567-68.  General jurisdiction exists only when the defendant's general business contacts with the forum are "continuous and systematic," <u>id.</u>, and we do not read the Complaint as alleging that such jurisdiction exists as to any Moving Defendant.  Specific jurisdiction, on the other hand, may be available in a suit "arising out of or related to the defendant's contacts with the forum."  <u>Id.</u>  To assert specific jurisdiction over a defendant, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  <u>Leasco</u>, 468 F.2d at 1340. Moreover, there must be a "significant causal relation between defendant's jurisdictional contacts and plaintiff's cause of action."  <u>Huang v. Sentinel Gov't Securities</u>, 657 F.Supp. 485, 488 (S.D.N.Y. 1987).

   Each defendant's contacts with the forum must be assessed individually.  <u>Calder v. Jones</u>, 465 U.S. 783, 790 (1984).  For convenience of discussion, we first address jurisdiction over defendants Ogrisek, Hersov and Sapinda and then discuss the status of Mr. Windhorst.

---

[12] For purposes of the minimum contacts analysis under the Exchange Act, the relevant "forum" is the United States.  <u>See</u>, <u>e.g.</u>, <u>FDIC v. Milken</u>, 781 F.Supp. 226, 229 (S.D.N.Y. 1991).

A.   **PLAINTIFFS' CLAIMS AGAINST OGRISEK, HERSOV AND SAPINDA MUST BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER THEM WITH RESPECT TO SUCH CLAIMS.**

   1.   **Ogrisek and Hersov Have Insufficient Contacts With the Forum to Warrant this Court's Exercise of Personal Jurisdiction Over Them.**

Plaintiffs egregiously fail to allege facts supporting this Court's exercise of specific jurisdiction over Ogrisek and Hersov – indeed, the Complaint contains virtually no allegations, and certainly no fact-specific, non-conclusory allegations, describing any "contacts" of Ogrisek and Hersov with the United States that might relate to Plaintiffs' claims.

According to Plaintiffs, Ogrisek, a "citizen and resident of Germany," was at all times relevant to the Complaint, a "Managing Director" of Vatas (Compl. ¶ 13), while Hersov is "a citizen of South Africa and resident of Great Britain," who is not alleged to have been an officer of Vatas, but merely allegedly the "principal shareholder of Sapinda," which was the owner in turn of Vatas (id. ¶¶ 14, 15). Even assuming that Vatas were itself subject to the personal jurisdiction of this Court, the mere allegation that Ogrisek is a "Managing Director" of Vatas does not constitute sufficient contacts with the forum to support personal jurisdiction. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781, n. 13 (1984) ("jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him"); In re Rhodia S.A. Securities Litg., 531 F.Supp.2d 527, 542 (S.D.N.Y. 2007) (foreign defendant executives not subject to personal jurisdiction by mere fact of being defendant company's president and COO); Charas v. Sand Tech. Sys. Int'l, Inc., No. 90 Civ. 5638, 1992 WL 296406, at *4 (S.D.N.Y. 1992) (defendant board director not subject to personal jurisdiction by mere fact of being director). Even more clearly, the mere allegation upon information and belief that Hersov (a South African citizen residing in Great Britain) is the principal shareholder of *Sapinda* cannot be sufficient for jurisdictional purposes, as Hersov is not even alleged to be a

10

director or officer of Vatas (nor, indeed, of Sapinda), and Sapinda is nowhere alleged to have had contacts with the United States relating to Plaintiffs' claims (infra, p. 13-14).

In the entire 56 paragraphs comprising the "facts" portion of the Complaint, Plaintiffs refer to Ogrisek and Hersov exactly four times, putting aside the paragraphs merely identifying them (Compl. ¶¶ 13, 15). Two of those instances set forth allegations about alleged investment activity *in Germany* with respect to a German company unrelated to RMDX (id. ¶¶ 20-21); such allegations do not imply any contacts *with the United States* in connection with Plaintiffs' alleged claims about RMDX shares.

There is a conclusory assertion in the introductory section of the Complaint that Ogrisek and Hersov, "through Vatas," acquired shares and warrants in RMDX in "off-market transactions" (id. ¶ 5),[13] but there is no explanation as to why, if this had occurred at some unspecified "off-market" locale (assumedly in Germany), that fact would support personal jurisdiction in the United States over these individuals on Plaintiffs' claims. Complaint ¶ 35 then adds a totally conclusory allegation with respect to Ogrisek's and Hersov's supposed roles in the alleged scheme to manipulate RMDX prices.[14] The allegation with respect to what Ogrisek and Hersov supposedly "knew" is facially speculative and conclusory, and there is no way to translate such supposed "knowledge," assumedly possessed by Ogrisek and Hersov wherever those persons were located (and hence *not* in the United States) into *contacts* with United States. And the allegation that these two individuals "orchestrated" the OTCBB scheme is utterly conclusory, unsupported by any factual allegation describing conduct by either individual.

---

[13] Paragraph 5 provides, in part: "Commencing in or around 2006, defendants Robert B. Hersov ('Hersov'), Lars Windhorst ('Windhorst') and Peter A. Ogrisek ('Ogrisek'), through VATAS Holdings GmbH ('Vatas'), acquired shares and warrants in RMDX through private placements and other off-market transactions."

[14] Paragraph 35 provides, in part: "Upon information and belief, the defendants, specifically Hersov, Windhorst, Ogrisek and Vatas, knew that the active trading that they orchestrated would have a significant impact upon the market price for RMDX common stock."

Nor is the fact that Ogrisek and Hersov (and Sapinda, to which we next turn) are alleged to be "controlling persons" of Vatas under Section 20(a) of the Exchange Act (id. ¶¶ 70-73) sufficient to establish personal jurisdiction over Ogrisek or Hersov (or Sapinda).  Even assuming, *arguendo*, that Plaintiffs had adequately pled a cause of action against Ogrisek and Hersov for controlling person liability under Section 20(a) (which the plaintiffs have not, since merely being an officer or indirect owner of a company is not enough), being a corporation's "controlling person" within the meaning of Section 20(a) is, by itself, insufficient to establish personal jurisdiction.  See In re Rhodia, 531 F.Supp.2d at 542 ("Being a corporation's control person of itself does not . . . merit personal jurisdiction"); In re Parmalat, 376 F.Supp.2d at 454 (being a control person alone "would be insufficient to warrant the conclusion that [the control person's] contacts with the United States satisfied the requirements of due process").

Nowhere do Plaintiffs allege that either Ogrisek or Hersov had any dealings with Plaintiffs, or that either person transacted any RMDX trades on a U.S. market.  In fact, the Complaint contains no allegations whatsoever as to any specific acts committed by Ogrisek and Hersov that constituted part of the misconduct alleged in the Complaint (which is, of course, why the Complaint also does not state a Section 10(b) claim against these defendants (infra, pp. 27-28)).[15]

These conclusory and non-fact-specific allegations do not establish a *prima facie* showing of personal jurisdiction.  See In re Rhodia, 531 F.Supp.2d at 542 (complaint dismissed for lack of person jurisdiction over defendant executives where plaintiffs "have not set forth any specific allegation that [defendant executives] issued any statements, effectuated any transactions, or authorized any acquisitions that constitute the misconduct alleged in the

---

[15] We fail to see how the allegation that a Mr. Desmond, who is not a party, made a profit on an RMDX trade that apparently occurred outside the U.S. market (Compl., n. 2) has anything to do with *this* case, but it certainly has nothing to do with jurisdiction over the Moving Defendants.

Complaint"); Charas, 1992 WL 296406, at *5 (complaint dismissed for lack of personal

jurisdiction where defendant director "neither entered the United States nor transacted any

business in the United States for or in connection with [defendant company]").

### 2. Sapinda Has Insufficient Contacts With the Forum to Warrant this Court's Exercise of Personal Jurisdiction Over It.

Plaintiffs' allegations with respect to Sapinda are even more sparse than their

allegations relating to Ogrisek and Hersov. In the entire "facts" portion of the Complaint,

Plaintiffs refer specifically to Sapinda exactly once, in paragraph 14, which merely serves to

identify Sapinda as the sole shareholder of Vatas.[16]

Plaintiffs have completely failed to allege that Sapinda engaged in any acts that

establish contacts with this forum. See Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998-1000

(2d Cir. 1975) (Canadian investment house not subject to personal jurisdiction where it did not

transact business or perform act in the U.S., and did not perform act elsewhere causing an effect

in the U.S.); Huang, 657 F.Supp. at 490 (foreign corporate defendant not subject to personal

jurisdiction where there are no acts by which defendant purposefully availed itself of the

privileges of conducting activities in the forum); Ryan v. Allen, No. 97 Civ. 0055, 1997 WL

567777, at *2 (S.D.N.Y. 1997) (same).

Conclusory "controlling person" allegations (Compl. ¶ 71) do not suffice for

jurisdiction, even at the pleading stage (supra, p. 12). More generally, "a parent-subsidiary

relationship does not itself create jurisdiction over the person unless the subsidiary is the alter

ego of the parent or a mere agent acting at the parent's directions." Milken, 781 F.Supp. at 230.

The Complaint alleges neither. Plaintiffs do allege that "[u]pon information and belief, Vatas

---

[16]  Paragraph 14 provides: "[Sapinda] is, upon information and belief, a private corporation organized under the laws of Great Britain with a principal office located at 86 Jermyn Street, London, SW1Y, United Kingdom. Sapinda is, upon information and belief, the sole shareholder of Vatas."

was insolvent when it executed the Settlement Agreement [on June 10, 2008] and failed to observe corporate formalities" (Compl. ¶ 83).  Such a conclusory allegation is insufficient to establish personal jurisdiction over Sapinda on a veil-piercing theory.[17]  See In re Ski Train Fire in Kaprun, Austria, 230 F.Supp.2d 403, 410 (S.D.N.Y. 2002) (allegation that foreign corporate defendants "fail to observe proper corporate formalities is entirely conclusory").

In determining whether to pierce the corporate veil for purposes of personal jurisdiction where common ownership is established, courts have examined such factors as: (i) financial dependency of the subsidiary on the parent (such as interest free loans or guarantees); (ii) the "degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities" (such as overlapping officers); and (iii) the "degree of control over the marketing and operational policies of the subsidiary exercised by the parent" (such as training of personnel, determination of policy, etc.). Volkswagenwerk AG v. Beech Aircraft Corp., 751 F.2d 117, 120-22 (2d Cir. 1984).  Mere conclusory regurgitations of the factors discussed in Beech Aircraft, without supporting factual allegations, cannot establish personal jurisdiction over a foreign parent corporation, as the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Jazini, 148 F.3d at 185 (court rejected conclusory restatements in the complaint with respect to two of the four factors in Beech Aircraft).[18]

---

[17]  Plaintiffs' veil-piercing claim against Sapinda, of course, would also depend on this Court having personal jurisdiction over Vatas.  Vatas has not appeared in this action, and the Moving Defendants make no admissions as to whether Vatas is subject to the personal jurisdiction of this Court.

[18]  Plaintiffs have not even made a conclusory try at these hurdles: there is no factual allegation that Sapinda has *any* role in the operation of Vatas – the supposed liability of Vatas is premised on the alleged activities of Windhorst as an officer *of Vatas*.  See also Schenker v. Assicurazioni Generali S.P.A., No. 98 Civ. 9186, 2002 WL 1560788, at *8 (S.D.N.Y. 2002) (dismissal required where plaintiffs "made only a weak allegation with respect to one of the four factors [in Beech Aircraft], and have made no allegations with regard to the other three factors"); In re Ski Train Fire, 230 F.Supp.2d at 410-12 (insufficient allegations with respect to the four Beech Aircraft factors warranted dismissal); JLB Equities, Inc. v. Ocwen Fin. Corp., 131 F.Supp.2d 544, 549-50 (S.D.N.Y. 2001) (same).

3.    **The Reasonableness Inquiry**

Since Plaintiffs have so clearly failed to establish that Ogrisek, Hersov and

Sapinda have sufficient minimum contacts with the United States, the Court need not conduct the

second-step reasonableness inquiry. See Metropolitan Life, 84 F.3d at 573 (court is required to

conduct reasonableness inquiry "[o]nce a plaintiff has demonstrated the requisite minimum

contacts between the defendant and the forum").

B.    **PLAINTIFFS' CLAIMS AGAINST WINDHORST SHOULD ALSO BE
      DISMISSED BECAUSE THIS COURT LACKS PERSONAL
      JURISDICTION OVER HIM WITH RESPECT TO PLAINTIFFS'
      CLAIMS.**

Although the Complaint contains numerous allegations about Mr. Windhorst, a

careful reading of these allegations demonstrates that they meet neither the minimum contacts

test nor the reasonableness inquiry as to *Plaintiffs'* claims against Windhorst.

1.    **Windhorst Has Insufficient Contacts With the Forum to Warrant the
      Exercise of Personal Jurisdiction Over Him on Plaintiffs' Claims.**

According to the Complaint, the alleged manipulative trading of RMDX shares on

the OTCBB Market implemented by Plaintiffs was instigated by Windhorst from outside of the

United States, and Windhorst, a "citizen and resident of Germany" is not alleged to have entered

the United States or otherwise conducted transactions in the United States in connection with the

alleged manipulative scheme. Not only did Plaintiffs themselves perpetrate the manipulation of

the OTCBB Market, but *their securities dealings* with Vatas were not conducted on that market,

but rather "off-market" in Switzerland, and there is no allegation that Vatas or Windhorst ever

bought or sold any RMDX stock on the OTCBB Market. Moreover, while Plaintiffs may have

been motivated or emboldened by Vatas in carrying out the manipulation, they did not plead that

they merely acted as an agent for Vatas – sometimes they kept the RMDX stock, and sometimes

they laid if off; what they did was "purchase and accumulate large quantities of RMDX with the *expectation* of selling those shares to Vatas" (Compl. ¶ 33, emphasis added); the Broken Trade stock had been in the Funds' account at Goldman and was returned to that account (id. ¶ 49).[19]

The mere fact that an injured plaintiff is a U.S. entity does not, by itself, suffice to establish the requisite "effects" within the United States. See S.E.C. v. Unifund, 910 F.2d 1028, 1033 (2d Cir. 1990) ("not every causal connection between action abroad and ultimate injury to American investors will suffice"). Similarly, the mere fact that the stock involved is that of a U.S. company does not, without more, establish sufficient "effects" within the United States. Unifund, 910 F.2d at 1033 ("Not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States").

The Complaint makes quite clear that the very premise of the relationship between Plaintiffs, Windhorst and Vatas was that Windhorst and Vatas did not want to be involved with the U.S. markets, and that, as Plaintiffs tell the story, Plaintiffs obtained their initially profitable arrangement with Vatas precisely *because* Plaintiffs proposed to insulate Vatas from any such involvement. Certainly Plaintiffs are clear that *their transactions with Vatas* were deliberately structured to occur outside the U.S., and that it was the parties' intent to avoid, rather than "purposely avail" themselves of the privileges of, conducting the business between them in the U.S. or invoking U.S. law.[20] Plaintiffs, in short, have not alleged that Windhorst transacted any business or performed any act in the United States in connection with *their* securities transactions with Vatas, and their damage claims are based on *these* dealings.

---

[19] One can be confident that since Plaintiffs admittedly were using the RMDX stock to satisfy margin requirements (id.), they did not tell Goldman that they held the stock only as an agent.

[20] Thus, the Funds' trades with Vatas were effectuated through a foreign employee (Ruiz) of a foreign financial institution (Credit Suisse), working in its Zurich offices; and the Funds' trades with Vatas were completed on a DVP basis, with the RMDX shares being transmitted by Plaintiffs to an agent to be delivered to Credit Suisse in Switzerland and paid for by Credit Suisse in Switzerland.

Plaintiffs allege that they made a business decision to withdraw the final tender of RMDX stock made to Credit Suisse in Switzerland to protect their own margin accounts at Goldman Sachs (Compl. ¶ 49). It is quite striking that Plaintiffs do not allege that the Final Contract, which Plaintiffs plead superseded this Broken Trade, was negotiated or executed in the U.S. It is conspicuously apparent that the Final Contract has no provision for application of U.S. law or for jurisdiction in the U.S. in an action for breach, and that the trades called for in the Final Contract were going to be executed privately and not performed in the United States.

In sum, while perhaps a victim of *Plaintiffs'* manipulation of the OTCBB Market could frame an argument for personal jurisdiction over Windhorst for allegedly instigating and financially back-stopping Plaintiffs' manipulation of the OTCBB Market, *Plaintiffs* do not stand in those shoes – they are the self-proclaimed manipulators, not the victims of the OTCBB manipulations, and *they* are complaining only about a busted trade expected to close in a foreign transaction which Plaintiffs decided to cancel and replace with a revised transaction that had absolutely no ties to the United States.

Plaintiffs do not demonstrate that Windhorst "purposefully availed [himself] of the privilege of conducting activities within the [United States], thus invoking the benefits and protections of its laws" with respect to the transactions between the Funds and Vatas. Leasco, 468 F.2d at 1340. Quite to the contrary, Plaintiffs did their best to accommodate Vatas in keeping their direct business dealings outside this forum in every possible respect.

2.  **Even Assuming, *Arguendo*, that Windhorst Has Sufficient Contacts with the United States, It Would Be Unreasonable for the Court to Exercise Personal Jurisdiction Over Him.**

An exercise of personal jurisdiction over Windhorst would not comport with "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington,

17

326 U.S. 310, 316 (1945).  Under the reasonableness inquiry, the Court determines whether the assertion of personal jurisdiction "is reasonable under the circumstances of the particular case." Metropolitan Life, 84 F.3d at 568 (enumerating factors to be weighed).

      The Funds were sophisticated business entities apparently experienced in securities trading and investments, being "hedge funds engaged in the purchase and sale of securities" (Compl. ¶ 28).  The Funds knowingly and voluntarily entered into trading transactions with a German entity (Vatas) doing business in Germany, and according to Plaintiffs, not willing to trade in the U.S. markets itself, with the entity being represented by Windhorst, a citizen and resident of Germany.  The transactions between the Funds and Vatas were effectuated through a foreign financial institution (Credit Suisse), on a DVP basis, with the shares being delivered to Credit Suisse in Switzerland.  When a problem arose with a tender of RMDX shares to that foreign financial institution, the Funds entered into an agreement which released Windhorst (and others) from any claims, and *that* agreement has no apparent "contacts" with the United States.  In such circumstances Windhorst could not have reasonably anticipated being "haled into court" here.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Metropolitan Life, 84 F.3d at 575 (connections with forum too attenuated to permit exercise of personal jurisdiction under reasonableness inquiry).

**C.   IN THE ABSENCE OF PERSONAL JURISDICTION ON THE FEDERAL SECURITIES CLAIMS, PLAINTIFFS' REMAINING STATE LAW CLAIMS AGAINST THE MOVING DEFENDANTS SHOULD ALSO BE DISMISSED.**

      Plaintiffs no longer assert that diversity jurisdiction exists over the non-federal claims, and it is well established that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well in the absence of an independent basis for subject matter jurisdiction."  United Mine Workers of

America v. Gibbs, 383 U.S. 715, 726 (1966).  Dismissal of Plaintiffs' state law claims is

especially appropriate here "given the early stage of the litigation and the fact that the remaining

claims are matters of state law." Kelter v. Apex Equity Options Fund, L.P., No. 08 Civ. 2911,

2009 WL 2599607, at *10 (S.D.N.Y. 2009).  Thus, there is no reason to address the question of

personal jurisdiction over these defendants on the state law claims (though it is painfully obvious

that none exists in the Southern District of New York, since absolutely no connection between

Plaintiffs' claims and New York is alleged).

**POINT II**

**IN THE EVENT THE COMPLAINT WERE NOT DISMISSED AS TO A
MOVING DEFENDANT FOR LACK OF PERSONAL JURISDICTION,
THE RELEASE WOULD STILL REQUIRE DISMISSAL OF ALL OF
PLAINTIFFS' CLAIMS AGAINST SUCH MOVING DEFENDANT.**

The Final Contract is deemed incorporated in the Complaint for purposes of this

motion, and, upon such incorporation, application of the Release and covenant-not-to-sue

provisions in the Final Contract requires dismissal of all of Plaintiffs' claims against the Moving

Defendants (except perhaps Plaintiffs' contract claim seeking to enforce the Final Contract

against Sapinda on a veil-piercing theory, for which non-federal claim there would then remain

no possible basis for jurisdiction in this Court).

**A.      THE RELEASE IS VALID AND ENFORCEABLE.**

A settlement agreement "is a contract that is interpreted according to general

principles of contract law." Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir. 2007).  Like any

other contract, once entered into, a settlement agreement is "binding and conclusive," id., unless

a party seeks to invalidate that contract for a sufficient cause, such as fraud or mistake.  See

Willgerodt v. Hohri, 953 F.Supp. 557, 560 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998).

Mere "afterthought" or "change of mind" are not sufficient to invalidate a settlement agreement.

19

Id. To the contrary, settlement agreements "are strongly favored in New York and may not be lightly cast aside." Id.; see also Rivera v. New York, 115 A.D.2d 431, 432, 496 N.Y.S.2d 230 (1st Dep't 1985).

Here, in fact, the Complaint does not seek to invalidate (rescind) the Final Contract, but to enforce it, and to collect damages based on the balance due, whether from Vatas or Sapinda (Comp. ¶¶ 77-85). Plaintiffs have simply ignored (and failed to disclose to the Court) the full terms of the contract they seek to enforce.

The Release provides:

> Except for such obligations as are set forth herein, the Parties agree to a mutual release of all claims and obligations directly or indirectly related to the Trade or the Settlement Agreement terminated herewith, which release shall apply to all Released Persons and shall be effective upon signing this Agreement. Pursuant to such release, the Parties agree that the payments according to Section 2 shall in either case constitute full and final settlement of any and all claims of Alki or liabilities of Vatas to Alki or any of their affiliates.

Final Contract § 5. By its plain language, the Release became effective upon *signing* of the Final Contract (which is when Plaintiffs admit that they got at least $2,000,000 (Comp. ¶ 52)), and it discharges "all claims and obligations directly or indirectly related to the Trade," and extends to "all Released Persons." The term "Released Persons" is earlier defined to include any Party to the agreement "or any of its affiliates, or any of such [Party's] or its affiliate's directors, officers, employees, agents or advisors" (Final Contract § 4(a)).

In addition to the Release itself, the Final Contract contains a covenant-not-to-sue (id.), which prohibits any related future suit by the Funds against any defined "Released Persons," except a suit against "a Party" for breach of *that* agreement (with the Funds, their general partner and investment manager, Alki Capital Management LLC (Comp. ¶ 29), and Vatas being the *only* defined Parties).

20

Viewed in the context of the entire settlement agreement, there is no ambiguity as to the purpose and meaning of the Release, or of Final Contract § 4(a). See, e.g., Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000), (determining whether a contract is ambiguous by "examining the context of the entire integrated agreement").[21]

What the Funds got from the series of New Contracts was a written document embodying a specific financial obligation running from Vatas (but no one else) to the Funds, where before the Funds had at best uncertain and unclear rights based at most on "understandings" or "expectations" (Compl. ¶¶ 31, 33) which they might, or might not, be able to prove. Moreover, by entering into the Final Contract and its predecessors, the Funds obtained at least $2,000,000, a rather substantial collection from a company Plaintiffs now allege was insolvent at the time the Final Contract was executed (id. ¶ 53).

The consideration for these two elements of substantial value – documentation and cash – passing to the Funds was the agreement that thereafter the Funds' claims would be *limited* to the Final Contract. Since Vatas became entitled to receive *any* RMDX stock under the Final Contract only upon making additional payments beyond the $2,000,000 (and since the obvious point of the Final Contract was that Vatas was agreeing to pay far more than the true market value of the stock at the time the contract was executed), Vatas was getting nothing for its execution of the various written agreements and its payment of (at least) $2,000,000 *except* the resolution of all prior/pre-existing disputes and the limitation of any future action to an action against Vatas on the Final Contract, and that is what the Funds agreed to, effective upon *signing* (which the Complaint acknowledges occurred on June 10, 2008 (id. ¶ 50)).

---

[21] Issues of contract interpretation, including whether a contract is ambiguous, are generally questions of law suitable for disposition on a motion to dismiss. See, e.g., Medtech Products Inc. v. Ranir, LLC, 596 F.Supp.2d 778, 807 (S.D.N.Y. 2008); Psenicska v. Twentieth Century Fox Film Corp., No. 07 Civ. 10972, 2008 WL 4185752, at *4 (S.D.N.Y. 2008).

The Final Contract by its terms superseded whatever claims Plaintiffs might have had about the "Broken Trade," as Plaintiffs admit (id. ¶¶ 50-51).  It is absolutely clear that both the Release and the covenant-not-to-sue were to become effective when the Final Contract was executed (the Release is "effective upon signing this agreement" – and the covenant does not provide for any delay, except as to Vatas).[22]

In sum, the Release and the covenant are valid terms of the contract the Funds made, and these terms are enforceable here.  See, e.g., Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113 (2d Cir. 1977) (plaintiff barred by release from bringing suit claiming federal securities law and state law claims); Ruskay v. Waddell, 552 F.2d 392 (2d Cir. 1977) (release barred mutual fund shareholders from bringing suit).

## B.   PLAINTIFFS HAVE RATIFIED THE RELEASE BY AFFIRMING THE FINAL CONTRACT.

Plaintiffs do not in their Complaint seek to rescind the Final Contract, and at this juncture, having extracted at least $2,000,000 and sued on the Final Contract, Plaintiffs could not now claim that the Release is somehow invalid or unenforceable.  A party who has accepted the benefits of an agreement will be deemed to have ratified it.  See, e.g., Dodge Street, LLC v. Livecchi, 32 Fed.Appx. 607, 611 (2d Cir. 2002) ("Perhaps the strongest indicia that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation"); H&H Acquisition Corp. v. Fin. Intranet Holdings, No. 98 Civ. 5269, 2009 WL 3496826, at *5 (S.D.N.Y. 2009) (same); Napolitano v. City of New York, 12 A.D.3d 194, 195, 783 N.Y.S.2d 584 (1st Dep't 2004) ("Having accepted the benefits of the settlement, plaintiff

---

[22]  In fact, the Release and some form of covenant-not-to-sue were contained in the very first settlement agreement and were thus *already* in effect (Allegaert Decl. Ex. 1).  Hence if the Final Contract was supposed to "supersede" the earlier agreements, such provisions affecting rights already granted to Released Persons (including those who were not parties to the agreement but who were beneficiaries of the Release and the covenant) would logically need to be immediately effective, and they were.

ratified the release, and is therefore barred from alleging duress in its execution"); McLean v. Balkoski, 125 A.D.2d 234, 236, 509 N.Y.S.2d 34 (1st Dep't 1986) (plaintiff's acceptance of payments under agreement constitutes ratification of agreement and "precludes plaintiff from attempting to repudiate it on the grounds of duress, fraud or overreaching"). Cf. Finkle v. Lasher, 178 A.D. 471, 473, 165 N.Y.S. 141 (3d Dep't 1917) (it would be a "strange rule of law" to permit plaintiff benefitting from a contract to repudiate its obligations).

Here, the Complaint admits that Vatas made, and the Funds accepted, at least $2,000,000 in a context where the Release would become effective upon signing of the Final Contract and hence independent of whether the subsequent payments were made.  Moreover, Plaintiffs seek to *enforce* the Final Contract against Vatas and Sapinda (Compl. ¶¶ 77-85).  They do not seek, and do not plead that they *ever* timely sought, to rescind the agreement.

**C.    IF PLAINTIFFS HAVE A "VEIL-PIERCING" CONTRACT CLAIM AGAINST SAPINDA DESPITE THE RELEASE, THAT CLAIM MUST BE DISMISSED FOR LACK OF JURISDICTION.**

Plaintiffs could, perhaps, argue that their veil-piercing claim against Sapinda premised on the Final Contract obligation (the Fifth Cause of Action) is not barred by the Release – although it would appear that this claims *is* nonetheless barred by the covenant in Final Contract § 4(a), since Sapinda is not a defined "Party" excluded from that covenant.  However, the Court need not resolve this issue, because the Fifth Cause of Action against Sapinda is for a contract-based liability (id. ¶ 84), a common law cause of action, and if the securities claims against Sapinda are barred by the Release, as they are, there would remain no federal subject matter jurisdiction over this isolated claim.  (Parenthetically, this would logically also be true with respect to the claim against Vatas on the Final Contract as well).

## POINT III

### THE COMPLAINT FAILS TO STATE A SECURITIES LAW CLAIM AGAINST ANY MOVING DEFENDANT BECAUSE PLAINTIFFS COULD NOT RELY ON THE SUPPOSED INTEGRITY OF A MARKET *THEY* WERE MANIPULATING AND PLAINTIFFS WERE NOT MISLED BY ANY MOVING DEFENDANT.

Plaintiffs' allegations as to how any Moving Defendant might have defrauded *them* do not meet the standards of Fed. R. Civ. P. 9(b) or the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1). Plaintiffs do not sufficiently plead that any Moving Defendant made a material misstatement to them that was the cause of their alleged losses, whether from the Broken Trade or under the Final Contract.[23] Rather, they plead only (and, again, the Moving Defendants are addressing what is pled without at all implying that such allegations are accurate) that a mutual scheme to manipulate the OTCBB Market for RMDX stock went smoothly for a while and then went sour when Vatas ran out of money, with Plaintiffs left "holding the bag" that *Plaintiffs* had woven.

Before we turn to the allegations against specific Moving Defendants (or lack thereof), two overarching points must be made.

### A.   AS THE IN PARI DELICTO PERPETRATORS OF THE ALLEGED FRAUD ON THE OTCBB MARKET, PLAINTIFFS ARE NOT ENTITLED TO INVOKE THE FEDERAL SECURITIES LAWS.

The in pari delicto doctrine bars a plaintiff's securities claims when "(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with

---

[23] Insofar as the Complaint alleges that the Moving Defendants did not disclose some facts to Plaintiffs (e.g., that Vatas supposedly was insolvent by June 10, 2008 (Compl. ¶ 53)), it must be stressed that a duty to disclose arises only when "one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Chiarella v. U.S., 445 U.S. 222, 228 (1980). No defendant was a fiduciary to either Fund, and the Complaint does not suggest otherwise.

the effective enforcement of the securities laws and protection of the investing public." Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310-11 (1985). The Complaint itself is sufficient to show that both Bateman prongs are satisfied here.

Plaintiffs say that they implemented the alleged OTCBB Market manipulation scheme agreed upon between them and Vatas (Compl. ¶¶ 5, 7, 31-40). Plaintiffs had their own position in RMDX stock which benefitted from the price inflation they created, and Plaintiff also made large profits from selling RMDX stock to Vatas privately, at a guaranteed mark-up (id. ¶ 31). Accordingly, Plaintiffs qualify for in pari delicto status. See Ross v. Bolton, 904 F.2d 819, 825 (2d Cir. 1990) (first prong met when plaintiff engaged in manipulation scheme by entering into pre-arranged trade to resell shares to a third party at a guaranteed profit); Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1090 (2d Cir. 1997) (first prong met when plaintiff "arranged to short sell copper contracts and then depress the price of copper contracts to reap a profit"); see also Pinter v. Dahl, 486 U.S. 622, 636 (1988) ("Plaintiffs who are truly in pari delicto are those who have themselves violated the law in cooperation with the defendant").

Second, when the "remedial purpose of the Exchange Act is to protect innocent investors," Ross, 904 F.2d at 826, precluding suit by these plaintiffs would not interfere with enforcement of the securities laws, because these plaintiffs were not "innocent investors," but perpetrators of the market manipulation, and the "investing public" is not well-served by allowing such perpetrators to invoke the benefit of laws intended to protect the victims. Indeed, the Funds' purchases of RMDX shares were "not an investment made pursuant to an arms-length transaction, but an attempt to profit from a 'sure thing'." Id. at 825. Precluding a federal securities suit by such plaintiffs would not "offend the underlying statutory policies" of the Exchange Act. Pinter, 486 U.S. at 638.

**B.**   **AS THE PERPETRATORS OF THE ALLEGED FRAUD ON THE OTCBB MARKET, PLAINTIFFS CANNOT ESTABLISH "REASONABLE RELIANCE" ON THAT MARKET OR CLAIM DAMAGES BASED ON THE DROP IN THE OTCBB MARKET PRICE THAT OCCURRED WHEN THEIR MANIPULATION STOPPED.**

Plaintiffs do not, and indeed cannot, allege reasonable reliance. See Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999) ("In order to make out a 10b-5 claim . . . the plaintiff must allege and prove, among other elements, reliance"). In a case involving a market manipulation scheme, the plaintiff "must establish that he or she engaged in a securities trade in *ignorance of the fact* that the price was affected by the alleged manipulation." Id. (emphasis added). Plaintiffs cannot allege this as to their purchases of RMDX shares on the OTCBB Market, because Plaintiffs themselves carried out that scheme.[24] See Gurary, 190 F.3d at 45 (complaint dismissed where plaintiff, by his own admission, knew about the market manipulation scheme); Scone Investments, L.P. v. American Third Market Corp., No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *6 (S.D.N.Y. 1998) (plaintiffs failed to state market manipulation claim where plaintiffs alleged that they purchased shares upon defendants' promise to repurchase shares later at a higher price).

For the same reason (i.e., that Plaintiffs were active and knowing participants in the scheme), Plaintiffs cannot allege recoverable damages caused by reason of the OTCBB scheme. See ATSI Communications, Inc. v. Shaar Fund, 493 F.3d 87, 101 (2d Cir. 2007) (market manipulation scheme requires plaintiff to allege, among other things, damages caused by reason of the scheme). On the one hand, Plaintiffs' damages arise from Vatas's alleged failure to purchase the RMDX shares pursuant to their alleged private deals, *not* from Plaintiffs being led astray by the OTCBB prices. See Gurary, 190 F.3d at 46, n. 9 (damages not recoverable if not

---

[24] We understand defendant Credit Suisse will make related arguments about the "integrity of the market" issues in its scheduled motion to dismiss the First Amended Complaint, and the Moving Defendants intend to incorporate these by reference.

caused by the alleged manipulative trading). On the other hand, Plaintiffs cannot recover for a loss that is based on the price of the RMDX stock after their manipulation stopped versus earlier inflated prices – *that* loss was self-inflicted by their earlier manipulation, whereas 'market manipulation" damages must be "caused by reliance on the assumption of an efficient market free of manipulation." ATSI, 493 F.3d at 101 (listing elements necessary to claim); see generally Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984) ("The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions").

**C.    PLAINTIFFS DO NOT OTHERWISE STATE A FEDERAL SECURITIES CLAIM AGAINST ANY MOVING DEFENDANT.**

Securities fraud claims must satisfy the heightened pleading requirements under Rule 9(b), which requires that "the circumstances constituting fraud" be stated with particularity. Fed. R. Civ. P. 9(b); see also ATSI, 493 F.3d at 99. The PSLRA also sets forth pleading requirements for private securities fraud actions. For example, where the plaintiff alleges a false statement or omission, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

**1.    Plaintiffs' Federal Securities Claims Against Ogrisek, Hersov and Sapinda Should be Dismissed Because the Complaint Contains No Specific Allegations Against Them.**

Plaintiffs allege violations of Section 10(b) against Ogrisek and Hersov, and violations of Section 20(a) against Ogrisek, Hersov and Sapinda. However, Plaintiffs make no specific, factual allegations about Ogrisek, Hersov or Sapinda in connection with these alleged violations (supra, pp. 10-14). Instead, Plaintiffs make a number of totally irrelevant allegations (e.g., Compl. ¶¶ 20-21), and offer only generalized, vague and conclusory allegations, typically

based only on "information and belief" for which no "facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), are stated.  These allegations invariably fail to specify the particular roles, acts or conduct of each of Ogrisek, Hersov and Sapinda.  (Compl. ¶¶ 4, 5, 7, 8, 25, 26, 35).

Where, as here, "multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) (complaint dismissed where "derelictions are pleaded against the defendants generally, with little or no specification as to individual roles").  General allegations of participation in the alleged scheme or violation, without specific allegations of each defendant's acts or roles with respect to the alleged scheme, are not sufficient.  See ATSI, 493 F.3d at 102-03 ("General allegations not tied to the defendants or resting upon speculation are insufficient"); Miller v. Lazard, Ltd., 473 F.Supp.2d 571, 590 (S.D.N.Y. 2007) (complaint does not satisfy Rule 9(b) and the PSLRA where plaintiffs "do not identify any specific act taken by [the defendants] with respect to their market manipulation claims, but rather include them in general assertions regarding the alleged fraudulent scheme"); Scone, 1998 WL 205338, at *7 (complaint dismissed against defendant bank where allegations "impermissibly lump together the conduct of all the defendants"); see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 843 (2d Cir. 1998) ("where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which *other parties* have committed a primary violation") (emphasis original).

2.   **Plaintiffs' Federal Securities Claims Against Windhorst Should be Dismissed Because Plaintiffs Have Not Sufficiently Pleaded Any Misrepresentation or Actionable Omission By Him Causing Their Losses.**

Plaintiffs' claims against Windhorst with respect to their alleged mutual manipulation of the OTCBB Market do not state an Exchange Act claim for the reasons discussed above.  It is not clear whether Plaintiff are attempting to plead a Section 10(b) claim against Windhorst on any other theory, but if they so intend, they have neither met the requirements of Rule 9(b) and the PSLRA in that regard, nor stated any coherent claim.

A claim based on the "failure to carry out a promise made in connection with a securities transaction is normally a breach of contract" claim, and no more.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993).  To plead a Section 10(b) claim, Plaintiffs must allege that Windhorst "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which [Plaintiffs] relied, and (5) that [Plaintiffs'] reliance was the proximate cause of its injury." ATSI, 493 F3d at 105.  To survive dismissal under Rule 12(b)(6), a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Mere "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," will not suffice. Id.  Moreover, under the pleading requirements of the PSLRA, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Plaintiffs have failed to satisfy these pleading requirements.  Indeed, the Complaint contains no plausible allegations whatsoever that

Windhorst made any misstatements to Plaintiffs, let alone the "reasons why the statement is misleading."

Plaintiffs do allege that "Defendants" made "commitments to purchase large blocks of RMDX" when Vatas had "no intention of honoring its commitments to purchase certain shares of RMDX" (Compl. ¶ 7). Although "making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration for the transfer of securities," the failure to perform "does not constitute fraud if the promise was made with a good faith expectation that it would be carried out". Luce v. Edelstein, 802 F.2d 49, 55-56 (2d Cir. 1986).[25]   In this case, the Complaint acknowledges that Vatas (and Windhorst, as a representative of Vatas) intended to, and repeatedly did, purchase what appear to have been millions of RMDX shares from Plaintiffs (Comp. ¶¶ 36-37). Indeed, as Plaintiffs admit, the reason that Vatas stopped purchasing RMDX shares from Plaintiffs in February of 2008 was Credit Suisse's freezing of Vatas's account and Credit Suisse's refusal to settle those trades (id. ¶¶ 42, 44). That the last in a series of transactions was not completed does not support the allegation that Vatas never intended to perform. See Murray v. Xerox Corp., 811 F.2d 118, 122 (2d Cir. 1987) ("fraudulent intent is not demonstrated by evidence of mere non-performance of a promise," citing Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 576-77 (2d Cir. 1969)); Elliot Assoc., L.P. v. Hayes, 141 F.Supp.2d 344, 355 (S.D.N.Y. 2000), aff'd, 26 Fed. Appx. 83 (2d Cir. 2002) (defendants' initial partial performance under contract was "compelling evidence that [defendants] intended to perform initially, thus negating any inference of fraudulent intent").

---

[25] We would note, however, that here Plaintiffs did *not* transfer the Broken Trade securities to Vatas, but retained them and later sold them on the OTCBB Market. The losses thus suffered were the result of *Plaintiffs* having earlier bought the shares at an inflated price which *they* created.

## CONCLUSION

For the foregoing reasons, the Moving Defendants' motion to dismiss the

Complaint should be granted in its entirety.

Dated: New York, New York
       March 5, 2010

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: _____
       Christopher Allegaert

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550
callegaert@abv.com

Attorneys for Defendants Lars Windhorst,
Peter A. Ogrisek, Robert B. Hersov and
Sapinda International Ltd.

James A. Beha II
Howard Chen,

       Of Counsel.

31